UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 4

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| DAFCO Tote Site | ) |
| 2698 Hickory Boulevard | ) |
| Hudson, North Carolina 28638 | ) CERCLA Docket No. 04-2019-9998 |
| | ) |
| Tailored Chemical Products, Inc. | ) |
| | ) |
| | ) |
| Respondent | ) |
| | ) |
| Proceeding Under Sections 104, 106(a), | ) **ADMINISTRATIVE SETTLEMENT** |
| 107 and 122 of the Comprehensive | ) **AGREEMENT AND ORDER ON** |
| Environmental Response, Compensation, | ) **CONSENT FOR REMOVAL ACTIONS** |
| and Liability Act, 42 U.S.C. §§ 9604, | ) |
| 9606(a), 9607 and 9622 | ) |
| | ) |

**ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT FOR
A REMOVAL ACTION**

# TABLE OF CONTENTS

I. JURISDICTION AND GENERAL PROVISIONS................................1
II. PARTIES BOUND ...............................................................1
III. DEFINITIONS...................................................................2
IV. FINDINGS OF FACT............................................................4
V. CONCLUSIONS OF LAW AND DETERMINATIONS.............................7
VI. SETTLEMENT AGREEMENT AND ORDER....................................8
VII. DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND
ONSCENE COORDINATOR   ...............................................8
VIII. WORK TO BE PERFORMED   ..............................................9
IX PROPERTY REQUIREMENTS ...............................................15
X. ACCESS TO INFORMATION ................................................17
XI. RECORD RETENTION ........................................................18
XII. COMPLIANCE WITH OTHER LAWS ........................................19
XIII. EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES ..................19
XIV. PAYMENT OF RESPONSE COSTS.............................................20
XV. DISPUTE RESOLUTION ......................................................20
XVI. FORCE MAJEURE ............................................................23
XVII. STIPULATED PENALTIES .....................................................24
XVIII. COVENANTS BY EPA .........................................................26
XIX. RESERVATIONS OF RIGHTS BY EPA .........................................27
XX. COVENANTS BY RESPONDENT ..............................................28
XXI. OTHER CLAIMS ...............................................................30
XXII. EFFECT OF SETTLEMENT/CONTRIBUTION ..................................30
XXIII. INDEMNIFICATION ...........................................................31
XXIV. INSURANCE....................................................................32
XXV. FINANCIAL ASSURANCE .....................................................32
XXVI. MODIFICATION ...............................................................36
XXVII. ADDITIONAL REMOVAL ACTION ...........................................37
XXVIII. NOTICE OF COMPLETION OF WORK .........................................37
XXIV. INTEGRATION/APPENDICES .................................................37
XXX. EFFECTIVE DATE..............................................................38

# I.    JURISDICTION AND GENERAL PROVISIONS

1.    This Administrative Settlement Agreement and Order on Consent ("Settlement") is entered into voluntarily by the United States Environmental Protection Agency (EPA) and Tailored Chemical Products, Inc. ("Respondent"). This Settlement provides for the performance of a removal action by Respondent and the payment of certain response costs incurred by the United States at or in connection with DAFCO Tote located at 2698 Hickory Boulevard, Hudson, North Carolina (the "Site").

2.    This Settlement is issued under the authority vested in the President of the United States by Sections 104, 106(a), 107, and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9604, 9606(a), 9607 and 9622 (CERCLA). This authority was delegated to the Administrator of EPA on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2923 (Jan. 29, 1987), and further delegated to Regional Administrators by EPA Delegation Nos. 14-14-C (Administrative Actions Through Consent Orders, Apr. 15, 1994) and 14-14-D (Cost Recovery Non-Judicial Agreements and Administrative Consent Orders, May 11, 1994). This authority was further redelegated by the Regional Administrator of EPA Region 4 to the Chief of the Emergency Response, Removal, and Prevention Branch by Regional Delegation 14-14-A (Determinations of Imminent and Substantial Endangerment), to the Chiefs of the Emergency Response, Removal, and Prevention Branch and the Superfund Enforcement and Community Engagement Branch by Regional Delegation 14-14-C (Administrative Actions through Consent Orders), and to the Chief of the Superfund Enforcement and Community Engagement Branch by Regional Delegation 14-14-D (Cost Recovery Non-Judicial Agreements and Administrative Consent Orders).

3.    EPA has notified the North Carolina Department of Environmental Quality (the "State") of this action pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

4.    EPA and Respondent recognize that this Settlement has been negotiated in good faith and that the actions undertaken by Respondent in accordance with this Settlement do not constitute an admission of any liability. Respondent do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement, the validity of the findings of facts, conclusions of law, and determinations in Sections IV (Findings of Fact) and V. (Conclusions of Law and Determinations) of this Settlement. Respondent agree to comply with and be bound by the terms of this Settlement and further agree that they will not contest the basis or validity of this Settlement or its terms.

# II.    PARTIES BOUND

5.    This Settlement is binding upon EPA and upon Respondent and its successors, and assigns. Any change in ownership or corporate status of a Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter such Respondent's responsibilities under this Settlement.

6.    The undersigned representative of Respondent certifies that he or she is fully authorized to enter into the terms and conditions of this Settlement and to execute and legally bind Respondent to this Settlement.

7. Respondent shall provide a copy of this Settlement to each contractor hired to perform the Work required by this Settlement and to each person representing any Respondent with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Settlement. Respondent or its contractors shall provide written notice of the Settlement to all subcontractors hired to perform any portion of the Work required by this Settlement. Respondent shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this Settlement.

## III. DEFINITIONS

8. Unless otherwise expressly provided in this Settlement, terms used in this Settlement that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Settlement or its attached appendices, the following definitions shall apply:

*"Action Memorandum"* shall mean the EPA Action Memorandum relating to the Site signed on May 7, 2019, by the Regional Administrator, EPA Region 4, or his/her delegate, and all attachments thereto. The "Action Memorandum" is attached as Appendix A.

*"Affected Property"* shall mean all real property at the Site and any other real property where EPA determines, at any time, that access or land, water, or other resource use restrictions are needed to implement the removal action, including, but not limited to, the following properties the approximate 25 acre parcel located at 2698 Hickory Boulevard, Hudson, Caldwell County, North Carolina 28638.

*"CERCLA"* shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

*"Day"* or *"day"* shall mean a calendar day. In computing any period of time under this Settlement, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

*"Effective Date"* shall mean the effective date of this Settlement as provided in Section XXX.

*"EPA"* shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

*"EPA Hazardous Substance Superfund"* shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

*"Future Response Costs"* shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this Settlement, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this Settlement, including but not limited

to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Section IX (Property Requirements) (including, but not limited to, cost of attorney time and any monies paid to secure or enforce access, including, but not limited to, the amount of just compensation), Section XIII (Emergency Response and Notification of Releases), Paragraph 69 (Work Takeover), Paragraph 91 (Access to Financial Assurance), including, but not limited to, the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e), Section XV (Dispute Resolution), and all litigation costs. Future Response Costs shall also include Agency for Toxic Substances and Disease Registry (ATSDR) costs regarding the Site, all Interim Response Costs, and all Interest on those Past Response Costs Respondent have agreed to pay under this Settlement that has accrued pursuant to 42 U.S.C. § 9607(a) beginning at the Effective Date.

*"Interest"* shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

*"Interim Response Costs"* shall mean all costs, including but not limited to direct and indirect costs, paid by the United States in connection with the Site incurred prior to the Effective Date, but paid after that date.

*"National Contingency Plan"* or *"NCP"* shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

*"NCDEQ"* shall mean the North Carolina Department of Environmental Quality and any successor departments or agencies of the State.

*"On-Site"* shall mean the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action, 40 C.F.R. § 300.400(e)(1).

*"Paragraph"* shall mean a portion of this Settlement identified by an Arabic numeral or an upper or lower case letter.

*"Parties"* shall mean EPA and Respondent.

*"RCRA"* shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

*"Respondent"* shall mean Tailored Chemical Products, Inc.

*"Section"* shall mean a portion of this Settlement identified by a Roman numeral.

*"Settlement"* shall mean this Administrative Settlement Agreement and Order on Consent and all appendices attached hereto (listed in Section XXIX (Integration/Appendices)). In the event of conflict between this Settlement and any appendix, this Settlement shall control.

*"Site"* shall mean the DAFCO Superfund Site, encompassing approximately 25 acres, located at 2698 Hickory Boulevard in Hudson, Caldwell County, North Carolina 28638, and depicted generally on the map attached to the Action Memo Appendix A.

*"State"* shall mean the State of North Carolina.

*"Transfer"* shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

*"United States"* shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" shall mean (a) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (b) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (c) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

*"Work"* shall mean all activities and obligations Respondent is required to perform under this Settlement except those required by Section XI (Record Retention).

## IV.    FINDINGS OF FACT

9. For the purposes of this Order, EPA finds that:

a. The Site is approximately 25 acres located at 2698 Hickory Boulevard in Hudson, Caldwell County, North Carolina. The Site consists of a 65,000 sq. foot Aluminum building with garage bays and loading docks. There is a storm water conveyance system and an intermittent stream flows near the Site border. There is a residential community approximately 200 feet upgradient from the facility. The Site has an entrance gate however there has been a history of trespassing and burglaries at the

b. The Site property is owned by Anderson Family Properties, LLC (Anderson).

c. Anderson leased the Site to Anderson Trucking Line from 1995 until 2009. Anderson Trucking used the Site as a trucking and distribution facility until 2004. Part of the facility is still used as trucking and distribution facility.

d. In 2015 Anderson leased a portion of the property to DAFCO, a North Carolina Corporation. DAFCO's business operations consisted of fabrication of wastewater treatment systems and the cleaning of wastewater totes for reuse. DAFCO advertised that it was a wastewater treatment provider capable of treating wastewater in compliance with all applicable

regulations such that it could then be discharged into the municipal sewer system. Beginning in early 2015 until February 2016 DAFCO's former landlord, Kiser Sawmill shipped approximately 9000 totes each containing approximately 275 gallons of wastewater and other liquids to the Site.

e. DAFCO entered into an Asset Purchase Agreement with Eco-Tote Container Services, LLC (Eco-Tote) located in Charlotte, NC. Under this agreement, Eco-Tote took over operation of the Site. Eco-Tote operated for a short time and processed only a few totes before also discontinuing its operations.

f. Both DAFCO and Eco-Tote have been administratively dissolved by the North Carolina Secretary of State and have abandoned the Site property leaving over 9000 totes containing liquids and sludges on the Site.

g. Many of the totes remaining on-Site bear shipping labels identifying Tailored Chemical Products, Inc. (Tailored). Tailored is corporation registered with the North Carolina Secretary of State with its principal place of business at 700 12th Street Drive, Hickory, Catawba County, North Carolina 28601.

h. Tailored is a mid-sized manufacturer of adhesives which began operations in 1977 in Hickory, North Carolina. Tailored manufactures hot melts, water-based glues, emulsion polymers, mastics, synthetic resins, and other specialty chemicals. A byproduct of the manufacturing process is creation of wastewater. Tailored stored the wastewater that it did not treat at its own facility in 275-gallon totes. Tailored contracted with DAFCO to clean its totes, treat and dispose of the wastewater contained in the totes, and return the clean totes to Tailored for reuse.

i. On May 10, 2018, the City of Hudson Fire Chief, reported to EPA's Region 4 National Response Center (NRC) there were many 275-gallon totes, abandoned at the Site and many of the totes appeared to be leaking. On May 11, 2018, in response, to the NRC report a Region 4 On-Scene Coordinator, was mobilized to the Site to determine whether an emergency response action was necessary. The OSC arrived on-site and met with NC DEQ, County EMA, local fire department, town officials and the property owner. The OSC observed approximately 9000 totes and less than 50 other containers of various sizes. The OSC observed very few markings or placards to identify the contents of the totes, several were labeled as corrosive. Liquid, in six 55-gallon drums, was screened, and pH levels were found to be less than 2.5. The property owner identified the liquid in the totes as industrial process wastewater and produced bills of lading for some of the totes indicating they contained nonhazardous water and adhesives. However, there was not a comprehensive inventory nor any other analytical data indicating what most of the totes contained.

j. Based on the presence of low pH drums and other unknowns the OSC issued a Notice of Federal Interest to PRPs and made recommendations to NCDEQ. The property owner made arrangements with an environmental contractor to address the stormwater runoff issues. NCDEQ took the lead for the Site and was to provide periodic oversight of the PRPs work.

k. On May 24, 2018, local authorities reported a liquid leaving the Site. The State's Regional Response Team 6 (RRT6) responded to the Site. RRT6 determined that the liquid leaving the Site was stormwater. While onsite, RRT6 tested several containers which were marked with corrosive labels and confirmed that the material had a low pH as previously reported.

l. On May 31, 2018, NCDEQ's Solid Waste Program (SWP) issued a Notice of Violation (NOV) to Anderson Family Properties and Tailored Chemical Products, Inc., for violations of the State Resource Conservation and Recovery Act (RCRA) Hazardous Waste Program under the Solid Waste Management Act (Act). The NOV required an assessment and inventory of the contents of the containers identified as industrial process wastewater abandoned on the property and specified that a plan of action would need to be approved prior to any waste being removed from the Site. A tote sampling plan of action was submitted to the SWP by Tailored Chemical on September 6, 2018, but the SWP determined that the plan did not adequately address the requirements set forth in the NOV. Following the issuance of the NOV, the SWP discovered that containers of corrosive materials were transferred from the Site to Celadon Recycling Solutions in Lincolnton, NC for reuse as a wastewater treatment product.

m. On January 24, 2019, the SWP received analytical data for one composite sample of glue and wastewater collected by the President of Tailored Chemical. The composite sample was collected from approximately 20 totes at the Site and was analyzed for Resource Conservation and Recovery Act (RCRA) characteristic constituents. The analytical data for the sample identified the presence of Tetrachloroethene (PCE) at 2.07 mg/l, which exceeds the RCRA regulatory level of 0.7 mg/l for Toxicity Characteristic and indicated that the containers of wastewater are a Toxicity Characteristic hazardous waste under RCRA (EPA Waste Code: D039).

n. On January 30, 2019, a SWP supervisor, sent an email to Anderson and Tailored Chemical notifying them of the sampling results. The email explained that because there was characteristic hazardous waste onsite, a hazardous waste characterization, and sampling plan for the totes must be submitted and approved by the SWP prior to initiating any further waste characterization activities. As the sampling confirmed that the totes held D039 hazardous wastewater the SWP's email advised the parties the totes must be immediately labeled as hazardous waste, marked with an accumulation start date, and be sent to a proper RCRA permitted treatment, storage & disposal facility within 90-days. In addition, Mr. Morris explained that the facility must obtain an EPA Identification Number and comply with all applicable large quantity generator regulations in 40 CFR 262.17 (e.g. RCRA training, emergency preparedness and container management requirements) prior to any additional material being transferred off-site.

o. The locals continued to express concern to the State about the totes as their condition was degrading, and there were reports of runoff form the Site. The State contended that Respondent has not complied with the NOV and felt the Site needed immediate attention and referred the Site to the State's Superfund program.

p.  On April 3, 2019, the NCDEQ Superfund Program referred the Site to Region 4 to conduct a Removal Site Evaluation (RSE).  On April 4, 2019, EPA OSC Ken Rhame deployed to the Site.  The OSC met the property owner at the Site and explained that he was conducting an evaluation of the Site pursuant to CERCLA. The OSC sought and received verbal access from the property owner to conduct a Site walk. During the Site visit, the OSC observed several thousand totes containing liquids and sludges. The OSC further observed that many of the totes were in poor condition and were leaking. The totes had been compromised by prolonged exposure to the elements, expansion and contraction from temperature swings. Many of the totes were stacked on wooden pallets two and three high. The pallets were collapsing under the weight of totes.

q.  The OSC also noted that trenches had been dug around some of the totes, there was water in the trenches, contents from the totes were entering the trenches mixing with the water and discharging off-site. There is a residential community approximately 200 feet from the facility. The OSC determined that based on his visual observations that further evaluation was required.

r.  After review of information from the State including the sample results collected by Tailored Chemical indicating the presence of PCE, the condition of the totes, the observations of contents of the totes releasing to the water and the proximity of the residential properties; the OSC determined that the material in compromised totes should immediately be transferred to a stable containment system.

s.  On April 5, 2019 the OSC returned to the Site and requested and received written access from the property owner.  The OSC advised the owner and Tailored Chemical (the two potentially responsible parties (PRPs), which had been identified of his determinations.  The OSC issued a CERCLA Notice of Federal Interest (NOFI) to the PRPs. The NOFI gave notice to the parties of their potential CERCLA liability and provided them the opportunity to conduct the work at the Site with EPA oversight. The two identified PRPs verbally agreed to conduct the emergency action and the removal of all the totes from the Site under an AOC with EPA oversight. On April 5, 2019, the PRPs procured a contractor and began the process of bulking and sampling the waste.

## V.  CONCLUSIONS OF LAW AND DETERMINATIONS

10.  Based on the Findings of Fact set forth above, and the administrative record, EPA has determined that:

a.  The DAFCO Tote Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b.  The contamination found at the Site, as identified in the Findings of Fact above, includes a "hazardous substance" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

c.      Each Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

d.      Each Respondent is a responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

(1)      Respondent Tailored Chemical Products, Inc., arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of the wastewater at the facility, within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

e.      The conditions described in Paragraphs 9(o) - 9(s) of the Findings of Fact above constitute an actual or threatened "release" of a hazardous substance from the facility as defined by Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

f.      The conditions described in Paragraphs 9(p)-9(r) of the Findings of Fact above may constitute an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the facility within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

g.      EPA determined in an Action Memorandum dated May 7, 2019, that the conditions at the Site may constitute an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the facility within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).]

h.      The removal action required by this Settlement is necessary to protect the public health, welfare, or the environment and, if carried out in compliance with the terms of this Settlement, will be consistent with the NCP, as provided in Section 300.700(c)(3)(ii) of the NCP.

## VI.  SETTLEMENT AGREEMENT AND ORDER

11.      Based upon the Findings of Fact, Conclusions of Law, and Determinations set forth above, and the administrative record, it is hereby Ordered and Agreed that Respondent shall comply with all provisions of this Settlement, including, but not limited to, all appendices to this Settlement and all documents incorporated by reference into this Settlement.

## VII.  DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR

12.      Respondent shall retain one or more contractors or subcontractors to perform the Work and shall notify EPA of the names, titles, addresses, telephone numbers, email addresses, and qualifications of such contractors or subcontractors within 3 days after the Effective Date. Respondent shall also notify EPA of the names, titles, contact information, and qualifications of any other contractors or subcontractors retained to perform the Work at least 3 days prior to commencement of such Work. EPA retains the right to disapprove of any or all of the contractors and/or subcontractors retained by Respondent. If EPA disapproves of a selected contractor or

subcontractor, Respondent shall retain a different contractor or subcontractor and shall notify EPA of that contractor's or subcontractor's name, title, contact information, and qualifications within 3 days after EPA's disapproval. With respect to any proposed contractor, Respondent shall demonstrate that the proposed contractor demonstrates compliance with ASQ/ANSI E4:2014 "Quality management systems for environmental information and technology programs – Requirements with guidance for use" (American Society for Quality, February 2014), by submitting a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, Reissued May 2006) or equivalent documentation as determined by EPA. The qualifications of the persons undertaking the Work for Respondent shall be subject to EPA's review for verification based on objective assessment criteria (e.g., experience, capacity, technical expertise) and that they do not have a conflict of interest with respect to the project.

13.     Within ten (10) days after the Effective Date, Respondent shall designate a Project Coordinator who shall be responsible for administration of all actions by Respondent required by this Settlement and shall submit to EPA the designated Project Coordinator's name, title, address, telephone number, email address, and qualifications. To the greatest extent possible, the Project Coordinator shall be present on Site or readily available during Site work. EPA retains the right to disapprove of the designated Project Coordinator who does not meet the requirements of Paragraph 29 and will notify and provide Respondent with the reason for such disapproval in writing. If EPA disapproves of the designated Project Coordinator, Respondent shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number, email address, and qualifications within seven (7) days following EPA's disapproval. Notice or communication relating to this Settlement from EPA to Respondent's Project Coordinator shall constitute notice or communication to Respondent.

14.     EPA has designated Kenneth Rhame of the Emergency and Enforcement Response Branch, Region 4 as its On-Scene Coordinator (OSC). EPA and Respondent shall have the right, subject to Paragraph, to change their respective designated OSC or Project Coordinator. Respondent shall notify EPA 3 days before such a change is made. The initial notification by Respondent may be made orally, but shall be promptly followed by a written notice.

15.     The OSC shall be responsible for overseeing Respondent's implementation of this Settlement. The OSC shall have the authority vested in an OSC by the NCP, including the authority to halt, conduct, or direct any Work required by this Settlement, or to direct any other removal action undertaken at the Site. Absence of the OSC from the Site shall not be cause for stoppage of work unless specifically directed by the OSC.

## VIII.   WORK TO BE PERFORMED

16..   Respondent shall perform, at a minimum, all actions necessary to implement the Action Memorandum. The actions to be implemented generally include, but are not limited to, the following:

A) The following actions are for the continuance and completion of the emergency action that was started on April 5, 2019: a. continue to bulk from aqueous waste material and sludges from compromised totes into an adequate containment system;

    b. Sample all bulked and/or other stockpiled on-Site aqueous waste and Sludges;

    c. Based on sampling and data analysis of material of the aqueous waste and sludges implement a disposal scheme subject to EPA approval;

    d. Begin the disposal process, at EPA approved disposal site, when analytical sample results are received;

    e. Implement any removal actions necessary to abate the threat to human health and the environment based on the sampling results and any further studies; and

    f. Transition from emergency response action to a time-critical removal action implement the following actions:

        i. Develop a Site Health and Safety Plan (Air Monitoring Plan for workers and public);
        ii. Submit a Sampling Analysis Plan (SAP)/ Quality Assurance Project Plan (QAPP) for environmental samples to be collected;
        iii. Develop a Site Work Plan to be reviewed and approved
        iv. Properly characterize, contain, transport and dispose (at an EPA-Approved Facility) of all hazardous substances on site;
        v. Prevent further off-site migration of contaminants;
        vi. Investigate areas suspect of releases, remove contaminated soils and properly characterize and dispose;
        vii. Perform post excavation confirmation samples to insure cleanup goals have been met;
        viii. Restore site disturbances caused from removal action to pre-removal conditions to the extent practicable; and
        ix. Develop and submit a final report illustrating site activities, sample results and disposal records.

17. For any regulation or guidance referenced in the Settlement, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after Respondent receives notification from EPA of the modification, amendment, or replacement.

18. <u>Work Plan and Implementation</u>

    a. Within 3 days after the Effective Date, in accordance with Paragraph 19 (Submission of Deliverables), Respondent shall submit to EPA for approval a draft work plan for

performing the removal action (the "Removal Work Plan") generally described in Paragraph 18 above. The draft Removal Work Plan shall provide a description of, and an expeditious schedule for, the actions required by this Settlement.

b.  EPA may approve, disapprove, require revisions to, or modify the draft Removal Work Plan in whole or in part. If EPA requires revisions, Respondent shall submit a revised draft Removal Work Plan within 5 days after receipt of EPA's notification of the required revisions. Respondent shall implement the Removal Work Plan as approved in writing by EPA in accordance with the schedule approved by EPA. Once approved, or approved with modifications, the Removal Work Plan, the schedule, and any subsequent modifications shall be incorporated into and become fully enforceable under this Settlement.

c.  Upon approval or approval with modifications of the Removal Work Plan Respondent shall commence implementation of the Work in accordance with the schedule included therein. Respondent shall not commence or perform any Work except in conformance with the terms of this Settlement.

d.  Unless otherwise provided in this Settlement, any additional deliverables that require EPA approval under Rremoval Work Plan shall be reviewed and approved by EPA in accordance with this Paragraph.

19.  Submission of Deliverables

a.  General Requirements for Deliverables

(1)  Except as otherwise provided in this Settlement, Respondent shall direct all submissions required by this Settlement to the OSC:

Kenneth Rhame

Respondent shall submit all deliverables required by this Settlement, or any approved work plan to EPA in accordance with the schedule set forth in such plan.

(2)  Respondent shall submit all deliverables in electronic form. Technical specifications for sampling and monitoring data and spatial data are addressed in Paragraph 19.b. All other deliverables shall be submitted to EPA in the form specified by the OSC. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5 x 11 inches, Respondent shall also provide EPA with paper copies of such exhibits

b.  Technical Specifications for Deliverables

(3)  Sampling and monitoring data should be submitted in standard Regional Electronic Data Deliverable (EDD) format. Other delivery methods may be allowed if electronic direct submission presents a significant burden or as technology changes.

(4)     Spatial data, including spatially-referenced data and geospatial data, should be submitted: (a) in the ESRI File Geodatabase format; and (b) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its EPA profile, the EPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the EPA Metadata Editor (EME), complies with these FGDC and EPA metadata requirements and is available at https://www.epa.gov/geospatial/epa-metadata-editor.

(5)     Each file must include an attribute name for each site unit or sub-unit submitted. Consult https://www.epa.gov/geospatial/geospatial-policies-and-standards for any further available guidance on attribute identification and naming.

(6)     Spatial data submitted by Respondent does not, and is not intended to, define the boundaries of the Site.

20.     <u>Health and Safety Plan.</u> Within 10 days after the Effective Date, Respondent shall submit for EPA review and comment a plan that ensures the protection of the public health and safety during performance of on-site work under this Settlement. This plan shall be prepared in accordance with "OSWER Integrated Health and Safety Program Operating Practices for OSWER Field Activities," Pub. 9285.0-OIC (Nov. 2002), available on the NSCEP database at https://www.epa.gov/nscep, and "EPA's Emergency Responder Health and Safety Manual," OSWER Directive 9285.3-12 (July 2005 and updates), available at https://www.epaosc.org/_HealthSafetyManual/manual-index.htm. In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration (OSHA) regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning. Respondent shall incorporate all changes to the plan recommended by EPA and shall implement the plan during the pendency of the removal action.

21.     <u>Quality Assurance, Sampling, and Data Analysis</u>

a.     Respondent shall use quality assurance, quality control, and other technical activities and chain of custody procedures for all samples consistent with "EPA Requirements for Quality Assurance Project Plans (QA/R5)" EPA/240/B-01/003 (March 2001, reissued May 2006), "Guidance for Quality Assurance Project Plans (QA/G-5)" EPA/240/R-02/009 (December 2002), and "Uniform Federal Policy for Quality Assurance Project Plans," Parts 1-3, EPA/505/B-04/900A-900C (March 2005).

b.     Within 10 days after the Effective Date, Respondent shall submit a Sampling and Analysis Plan to EPA for review and approval. This plan shall consist of a Field Sampling Plan (FSP) and a Quality Assurance Project Plan (QAPP) that is consistent with the [SOW] [Removal Work Plan], the NCP and "Guidance for Quality Assurance Project Plans

(QA/G-5)" EPA/240/R-02/009 (December 2002), "EPA Requirements for Quality Assurance Project Plans (QA/R-5)" EPA 240/B-01/003 (March 2001, reissued May 2006), and "Uniform Federal Policy for Quality Assurance Project Plans," Parts 1-3, EPA/505/B-04/900A-900C (March 2005). Upon its approval by EPA, the Sampling and Analysis Plan shall be incorporated into and become enforceable under this Settlement.

        c.      Respondent shall ensure that EPA personnel and its authorized representatives are allowed access at reasonable times to all laboratories utilized by Respondent in implementing this Settlement. In addition, Respondent shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance, quality control, and technical activities that will satisfy the stated performance criteria as specified in the QAPP and that sampling and field activities are conducted in accordance with the Agency's "EPA QA Field Activities Procedure," CIO 2105-P-02.1 (9/23/2014) available at http://www.epa.gov/irmpoli8/epa-qa-field-activities-procedures. Respondent shall ensure that the laboratories they utilize for the analysis of samples taken pursuant to this Settlement meet the competency requirements set forth in EPA's "Policy to Assure Competency of Laboratories, Field Sampling, and Other Organizations Generating Environmental Measurement Data under Agency-Funded Acquisitions" available at http://www.epa.gov/measurements/documents-about-measurement-competency-under-acquisition-agreements and that the laboratories perform all analyses according to accepted EPA methods. Accepted EPA methods consist of, but are not limited to, methods that are documented in the EPA's Contract Laboratory Program (http://www.epa.gov/clp), SW 846 "Test Methods for Evaluating Solid Waste, Physical/Chemical Methods" (https://www.epa.gov/hw-sw846), "Standard Methods for the Examination of Water and Wastewater" (http://www.standardmethods.org/), 40 C.F.R. Part 136, "Air Toxics - Monitoring Methods" (http://www3.epa.gov/ttnamti1/airtox.html).

        d.      However, upon approval by EPA, after a reasonable opportunity for review and comment by the State, Respondent may use other appropriate analytical method(s), as long as (i) quality assurance/quality control (QA/QC) criteria are contained in the method(s) and the method(s) are included in the QAPP, (ii) the analytical method(s) are at least as stringent as the methods listed above, and (iii) the method(s) have been approved for use by a nationally recognized organization responsible for verification and publication of analytical methods, e.g., EPA, ASTM, NIOSH, OSHA, etc. Respondent shall ensure that all laboratories they use for analysis of samples taken pursuant to this Settlement have a documented Quality System that complies with ASQ/ANSI E4:2014 "Quality management systems for environmental information and technology programs - Requirements with guidance for use" (American Society for Quality, February 2014), and "EPA Requirements for Quality Management Plans (QA/R-2)" EPA/240/B-01/002 (March 2001, reissued May 2006), or equivalent documentation as determined by EPA. EPA may consider Environmental Response Laboratory Network (ERLN) laboratories, laboratories accredited under the National Environmental Laboratory Accreditation Program (NELAP), or laboratories that meet International Standardization Organization (ISO 17025) standards or other nationally recognized programs as meeting the Quality System requirements. Respondent shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this Settlement are conducted in accordance with the procedures set forth in the QAPP approved by EPA.

e.      Upon request, Respondent shall provide split or duplicate samples to EPA and the State or its authorized representatives. Respondent shall notify EPA not less than 7 days in advance of any sample collection activity unless shorter notice is agreed to by EPA. In addition, EPA shall have the right to take any additional samples that EPA deem necessary. Upon request, EPA shall provide to Respondent split or duplicate samples of any samples they take as part of EPA's oversight of Respondent's implementation of the Work.

        f.      Respondent shall submit to EPA the results of all sampling and/or tests or other data obtained or generated by or on behalf of Respondent with respect to the Site and/or the implementation of this Settlement.

        g.      Respondent waives any objections to any data gathered, generated, or evaluated by EPA, the State or Respondent in the performance or oversight of the Work that has been verified according to the QA/QC procedures required by the Settlement or any EPA-approved Work Plans or Sampling and Analysis Plans. If Respondent objects to any other data relating to the Work, Respondent shall submit to EPA a report that specifically identifies and explains its objections, describes the acceptable uses of the data, if any, and identifies any limitations to the use of the data. The report must be submitted to EPA within 15 days after the monthly progress report containing the data.

        22.     **Progress Reports**. Respondent shall submit a written progress report to EPA concerning actions undertaken pursuant to this Settlement on a weekly basis, or as otherwise requested by EPA, from the date of receipt of EPA's approval of the Removal Work Plan until issuance of Notice of Completion of Work pursuant to Section XXVIII, unless otherwise directed in writing by the OSC. These reports shall describe all significant developments during the preceding period, including the actions performed and any problems encountered, analytical data received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

        23.     **Final Report**. Within 30 days after completion of all Work required by this Settlement, other than continuing listed in Paragraph 98 (notice of completion), Respondent shall submit for EPA review [and approval] a final report summarizing the actions taken to comply with this Settlement. The final report shall conform, at a minimum, with the requirements set forth in Section 300.165 of the NCP entitled "OSC Reports. The final report shall include a good faith estimate of total costs or a statement of actual costs incurred in complying with the Settlement, a listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination(s) of those materials, a presentation of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal action (e.g., manifests, invoices, bills, contracts, and permits). The final report shall also include the following certification signed by a responsible corporate official of a Respondent or Respondents' Project Coordinator: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage

the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

24. **Off-Site Shipments**

a. Respondent may ship hazardous substances, pollutants and contaminants from the Site to an off-site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondent will be deemed to be in compliance with CERCLA Section 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if Respondent obtain a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

b. Respondent may ship Waste Material from the Site to an out-of-state waste management facility only if, prior to any shipment, they provide written notice to the appropriate state environmental official in the receiving facility's state and to the OSC. This written notice requirement shall not apply to any off-Site shipments when the total quantity of all such shipments will not exceed ten cubic yards. The written notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. Respondent also shall notify the state environmental official referenced above and the OSC of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. Respondent shall provide the written notice after the award of the contract for the removal action and before the Waste Material is shipped.

c. Respondent may ship Investigation Derived Waste (IDW) from the Site to an off-Site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, EPA's "Guide to Management of Investigation Derived Waste," OSWER 9345.3-03FS (Jan. 1992), and any IDW-specific requirements contained in the Action Memorandum. Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 C.F.R. § 261.4(e) shipped off-Site for treatability studies, are not subject to 40 C.F.R. § 300.440.

## IX. PROPERTY REQUIREMENTS

25. **Agreements Regarding Access and Non-Interference.** Respondent shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by Respondent and the EPA, providing that such Non-Settling Owner shall, with respect to Affected Property: (i) provide the EPA, Respondent, and its representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the Settlement, including those activities listed in Paragraph 25.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the removal action.

a.      **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

(1)      Monitoring the Work;

(2)      Verifying any data or information submitted to the United States;

(3)      Conducting investigations regarding contamination at or near the Site;

(4)      Obtaining samples;

(5)      Assessing the need for, planning, implementing, or monitoring response actions;

(6)      Assessing implementation of quality assurance and quality control practices as defined in the approved quality assurance quality control plan;

(7)      Implementing the Work pursuant to the conditions set forth in (Work Takeover);

(8)      Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Respondent or its agents, consistent with Section 0 (Access to Information);

(9)      Assessing Respondent's compliance with the Settlement;

(10)      Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Settlement; and

(11)      Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions regarding the Affected Property.

26.      **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Respondent would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements, as required by this Section. If Respondent are unable to accomplish what is required through "best efforts" in a timely manner, they shall notify EPA, and include a description of the steps taken to comply with the requirements. If EPA deems it appropriate, it may assist Respondent, or take independent action, in obtaining such access and/or use restrictions. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section XIV (Payment of Response Costs).

27.      If EPA determines in a decision document prepared in accordance with the NCP that institutional controls in the form of state or local laws, regulations, ordinances, zoning

restrictions, or other governmental controls or notices are needed, Respondent shall cooperate with EPA's efforts to secure and ensure compliance with such institutional controls.

28. In the event of any Transfer of the Affected Property, unless EPA otherwise consents in writing, Respondent shall continue to comply with its obligations under the Settlement, including their obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property.

29. Notwithstanding any provision of the Settlement, EPA retains all of its access authorities and rights, as well as all of its rights to require land, water, or other resource use restrictions, including enforcement authorities related thereto under CERCLA, RCRA, and any other applicable statute or regulations.

## X. ACCESS TO INFORMATION

30. Respondent shall provide to EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within Respondent's possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this Settlement, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. Respondent shall also make available to EPA, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

31. **Privileged and Protected Claims**

   a. Respondent may assert all or part of a Record requested by EPA is privileged or protected as provided under federal law, in lieu of providing the Record, provided Respondent comply with Paragraph 31.b, and except as provided in Paragraph 31.c.

   b. If Respondent asserts such a privilege or protection, they shall provide EPA with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, Respondent shall provide the Record to EPA in redacted form to mask the privileged or protected portion only. Respondent shall retain all Records that they claim to be privileged or protected until EPA has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in Respondent's favor.

   c. Respondent may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological, or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that Respondent is required to create or generate pursuant to this Settlement.

32.    **Business Confidential Claims**. Respondent may assert that all or part of a Record provided to EPA under this Section or Section XI (Record Retention) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Respondent shall segregate and clearly identify all Records or parts thereof submitted under this Settlement for which Respondent asserts business confidentiality claims. Records that Respondent claims to be confidential business information will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA, or if EPA has notified Respondent that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Respondent.

33.    Notwithstanding any provision of this Settlement, EPA retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XI.    RECORD RETENTION

34.    Until ten (10) years after EPA provides Respondent with notice, pursuant to Section XXVIII (Notice of Completion of Work), that all Work has been fully performed in accordance with this Settlement, Respondents shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in their possession or control, or that come into their possession or control, that relate in any manner to their liability under CERCLA with regard to the Site, provided, however, that Respondents who are potentially liable as owners or operators of the Site must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. Each Respondent must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in their possession or control or that come into their possession or control that relate in any manner to the performance of the Work, provided, however, that each Respondent (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

35.    At the conclusion of the document retention period, Respondent shall notify EPA at least 90 days prior to the destruction of any such Records, and, upon request by EPA and except as provided in Paragraph 31 (Privileged and Protected Claims), Respondents shall deliver any such Records to EPA

36.    The Respondent certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by EPA or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XII. COMPLIANCE WITH OTHER LAWS

37.     Nothing in this Settlement limits Respondent's obligations to comply with the requirements of all applicable state and federal laws and regulations, except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-site actions required pursuant to this Settlement shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements (ARARs) under federal environmental or state environmental or facility siting laws.

38.     No local, state, or federal permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work), including studies, if the action is selected and carried out in compliance with Section 121 of CERCLA, 42 U.S.C. § 9621. Where any portion of the Work that is not on-site requires a federal or state permit or approval, Respondent shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals. Respondent may seek relief under the provisions of Section XVI (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals. This Settlement is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XIII. EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

39.     **Emergency Response**. If any event occurs during performance of the Work that causes or threatens to cause a release of Waste Material on, at, or from the Site that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Respondent shall immediately take all appropriate action to prevent, abate, or minimize such release or threat of release. Respondent shall take these actions in accordance with all applicable provisions of this Settlement, including, but not limited to, the Health and Safety Plan. Respondent shall also immediately notify the OSC or, in the event of his/her unavailability, the Regional Duty Officer at (404) 562-8700 of the incident or Site conditions. In the event that Respondent fails to take appropriate response action as required by this Paragraph, and EPA takes such action instead, Respondent shall reimburse EPA for all costs of such response action not inconsistent with the NCP pursuant to Section XIV (Payment of Response Costs).

40.     **Release Reporting**. Upon the occurrence of any event during performance of the Work that Respondent is  required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004, Respondent shall immediately orally notify the OSC or, in the event of his/her unavailability, the Regional Duty Officer at (404) 562-8700, and the National Response Center at (800) 424-8802. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103 of CERCLA, 42 U.S.C. § 9603, and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004.

41.     For any event covered under this Section, Respondent shall submit a written report to EPA within 7 days after the onset of such event, setting forth the action or event that occurred and the measures taken, and to be taken, to mitigate any release or threat of release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release or threat of release.

## XIV.   PAYMENT OF RESPONSE COSTS

### Payments of Future Response Costs

42.     Respondent shall pay to EPA all Future Response Costs not inconsistent with the NCP.

a.   Periodic Bills. On a periodic basis, EPA will send Respondent a bill requiring payment that includes a Superfund Cost Recovery Package Imaging and On-line System (SCORPIOS) Report, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and the United States Department of Justice. Respondent shall make all payments within thirty (30) days after Respondent's receipt of each bill requiring payment, except as otherwise provided in Paragraph 66 (*Contesting Future Response Costs*).

b.     Respondent may make payment to EPA by Fedwire Electronic Funds Transfer (EFT) to:

> Federal Reserve Bank of New York
> ABA=021030004
> Account = 68010727
> SWIFT address = FRNYUS
> 33 Liberty Street
> New York, NY 10045
> Field Tag 4200 of the Fedwire message should read "D 68010727 Environmental Protection Agency"

and shall reference Site/Spill ID Number C446 and the EPA docket number for this action. Respondent may make payment to EPA by Overnight Mail to:

> U.S. Bank
> 1005 Convention Plaza
> Mail Station SL-MO-C2GL
> St. Louis, MO 63101

and shall reference Site/Spill ID Number C446 and the EPA docket number for this action.

c.    At the time of payment, Respondent shall send notice that payment has been made to:

> Paula V. Painter
> U.S. EPA Region 4
> 61 Forsyth St., S.W.
> Atlanta, GA 30303
> Painter.paula@epa.gov

and to the EPA Cincinnati Finance Office by email at cinwd_acctsreceivable@epa.gov, or by mail to:

> EPA Cincinnati Finance Office
> 26 W. Martin Luther King Drive
> Cincinnati, Ohio 45268

Such notice shall reference Site/Spill ID Number C446 and the EPA docket number for this action.

43.    Deposit of Future Response Costs Payments. The total amount to be paid by Respondent pursuant to Paragraph 63.a (*Periodic Bills*) shall be deposited by EPA in the EPA Hazardous Substance Superfund.

44.    Interest. In the event that any payment for Future Response Costs is not made by the date required, Respondent shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of Respondent's payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondent's failure to make timely payments under this Section, including but not limited to, payment of stipulated penalties pursuant to Section XVII (*Stipulated Penalties*).

45.    Contesting Future Response Costs. Respondent may initiate the procedures of Section XV (*Dispute Resolution*) regarding payment of any Future Response Costs billed under Paragraph 63 (*Payments of Future Response Costs*) if it determines that EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if it believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. To initiate such dispute, Respondent shall submit a Notice of Dispute in writing to the OSC within 30 days after receipt of the bill. Any such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If Respondent submits a Notice of Dispute, Respondent shall within the 30-day period, also as a requirement for initiating the dispute, (a) pay all uncontested Future Response Costs to EPA in the manner described in Paragraph 63 *(Payment of Future Response Costs)* and (b) establish, in a duly chartered bank or trust company, an interest bearing escrow account that is insured by the Federal Deposit Insurance Corporation

(FDIC) and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Respondent shall send to the OSC a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If EPA prevails in the dispute, within five (5) days after the resolution of the dispute, Respondent shall pay the sums due (with accrued interest) to EPA in the manner described in Paragraph 63 (*Payments of Future Response Costs*). If Respondent prevails concerning any aspect of the contested costs, Respondent shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to EPA in the manner described in Paragraph 63 (*Payments of Future Response Costs*). Respondent shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XV (*Dispute Resolution*) shall be the exclusive mechanisms for resolving disputes regarding Respondent's obligation to reimburse EPA for its Future Response Costs.

## XV.  DISPUTE RESOLUTION

46.     Unless otherwise expressly provided for in this Settlement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement. The Parties shall attempt to resolve any disagreements concerning this Settlement expeditiously and informally.

47.     **Informal Dispute Resolution**. If Respondent objects to any EPA action taken pursuant to this Settlement, including billings for Future Response Costs, they shall send EPA a written Notice of Dispute describing the objection(s) within 15 days after such action. EPA and Respondent shall have 15 days from EPA's receipt of Respondent's Notice of Dispute to resolve the dispute through informal negotiations (the "Negotiation Period"). The Negotiation Period may be extended at the sole discretion of EPA. Any agreement reached by the Parties pursuant to this Section shall be in writing and shall, upon signature by the Parties, be incorporated into and become an enforceable part of this Settlement.

48.     **Formal Dispute Resolution**. If the Parties are unable to reach an agreement within the Negotiation Period, Respondent shall, within 20 days after the end of the Negotiation Period, submit a statement of position to the OSC. EPA may, within [20] days thereafter, submit a statement of position. Thereafter, an EPA management official at the Superfund Division level or higher will issue a written decision on the dispute to Respondent. EPA's decision shall be incorporated into and become an enforceable part of this Settlement. Respondent shall fulfill the requirement that was the subject of the dispute in accordance with  Dthe agreement reached or with EPA's decision, whichever occurs.

49.     Unless agreed to in writing by EPA, the invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of Respondent under this Settlement. Except as provided in Paragraph 59, stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending

resolution of the dispute. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Settlement. In the event that Respondent do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XVII (Stipulated Penalties).

## XVI.  FORCE MAJEURE

50.    "Force Majeure" for purposes of this Settlement, is defined as any event arising from causes beyond the control of Respondent, of any entity controlled by Respondent, or of Respondent's contractors that delays or prevents the performance of any obligation under this Settlement despite Respondent's best efforts to fulfill the obligation. The requirement that Respondent exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work, or increased cost of performance.

51.    If any event occurs or has occurred that may delay the performance of any obligation under this Settlement for which Respondent intends or may intend to assert a claim of force majeure, Respondent shall notify EPA's OSC orally or, in his or her absence, the alternate EPA OSC, or, in the event both of EPA's designated representatives are unavailable, the Director of the Waste Management Division, EPA Region 4, within 24 hours of when Respondent first knew that the event might cause a delay. Within 5 days thereafter, Respondent shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondent's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of Respondent, such event may cause or contribute to an endangerment to public health or welfare, or the environment. Respondent shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. Respondent shall be deemed to know of any circumstance of which Respondent, any entity controlled by Respondent, or Respondent's contractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude Respondent from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph 50 and whether Respondent have exercised their best efforts under Paragraph 50, EPA may, in its unreviewable discretion, excuse in writing Respondent's failure to submit timely or complete notices under this Paragraph.

52.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Settlement that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify

Respondent in writing of its decision. If EPA agrees that the delay is attributable to a force majeure, EPA will notify Respondent in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

53. If Respondent elects to invoke the dispute resolution procedures set forth in Section 0 (Dispute Resolution), they shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Respondent shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Respondent complied with the requirements of Paragraphs 50 and 51. If Respondent carries this burden, the delay at issue shall be deemed not to be a violation by Respondent of the affected obligation of this Settlement identified to EPA.

54. The failure by EPA to timely complete any obligation under the Settlement is not a violation of the Settlement, provided, however, that if such failure prevents Respondent from meeting one or more deadlines under the Settlement, Respondent may seek relief under this Section.

## XVII. STIPULATED PENALTIES

55. Respondent shall be liable to EPA for stipulated penalties in the amounts set forth in Paragraphs 56.a and 57 for failure to comply with the obligations specified in Paragraphs 56.b and 57, unless excused under Section XVI (Force Majeure). "Comply" as used in the previous sentence include compliance by Respondent with all applicable requirements of this Settlement, within the deadlines established under this Settlement.

56. Stipulated Penalty Amounts - Payments, Financial Assurance, Major Deliverables, and Other Milestones.

a. The following stipulated penalties shall accrue per violation per day for any noncompliance identified in Paragraph 56.b:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $ 250 | 5th through 14th day |
| $ 500 | 15th through 30th day |
| $ 1000 | 31st day and beyond |

b. **Obligations**

(1) Payment of any amount due under Section XIV (Payment of Response Costs).

(2) Establishment and maintenance of financial assurance in accordance with Section XXV (Financial Assurance).

(3)     Establishment of an escrow account to hold any disputed Future Response Costs under Paragraph 46 (Contesting Future Response Costs).

(4)     Timely submission of the Work Plan contemplated under Section VIII (*Work to be Performed*).

(5)     Timely submission of the Health and Safety Plan.

(6)     Payment of any amount due under Section XIV (*Payment of Response Costs*)

(7)     Timely performance of tasks constituting an element of the Work contemplated under the EPA-approved Work Plan.

(8)     Establishment and maintenance of financial assurance in accordance with Section XXV (*Financial Assurance*).

57.     **Stipulated Penalty Amounts – Other Deliverables**. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to this Settlement, other than those specified in Paragraph 56.b:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $ 200 | 5th through 14th day |
| $ 500 | 15th through 30th day |
| $ 1000 | 31st day and beyond |

58.     In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 69 (Work Takeover), Respondent shall be liable for a stipulated penalty in the amount of $50,000 "Stipulated penalties under this Paragraph are in addition to the remedies available to EPA under Paragraphs 69 (Work Takeover) and 91 (Access to Financial Assurance).

59.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. Penalties shall continue to accrue during any dispute resolution period, and shall be paid within 15 days after the agreement or the receipt of EPA's decision or order. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under Paragraph 18 (Work Plan and Implementation), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Respondent of any deficiency; and (b) with respect to a decision by the EPA Management Official at the Superfund Division Director level or higher, under Paragraph 48 (Formal Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the EPA Management Official issues a final decision regarding such dispute. Nothing in this Settlement shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement.

60. Following EPA's determination that Respondent has failed to comply with a requirement of this Settlement, EPA may give Respondent written notification of the failure and describe the noncompliance. EPA may send Respondent a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Respondent of a violation.

61. All penalties accruing under this Section shall be due and payable to EPA within 30 days after Respondent's receipt from EPA of a demand for payment of the penalties, unless Respondent invokes the Dispute Resolution procedures under Section XV (Dispute Resolution) within the 30-day period. All payments to EPA under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with Section XIII (Payment of Response Costs).

62. If Respondent fails to pay stipulated penalties when due, Respondent shall pay Interest on the unpaid stipulated penalties as follows: (a) if Respondent has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to Paragraph 59 until the date of payment; and (b) if Respondent fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under Paragraph 61 until the date of payment. If Respondent fails to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

63. The payment of penalties and Interest, if any, shall not alter in any way Respondent's obligation to complete the performance of the Work required under this Settlement.

64. Nothing in this Settlement shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Respondent's violation of this Settlement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Sections 106(b) and 122(*l*) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(*l*), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), provided however, that EPA shall not seek civil penalties pursuant to Section 106(b) or Section 122(*l*) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided in this Settlement, except in the case of a willful violation of this Settlement or in the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 69 (Work Takeover).

65. Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement.

## XVIII. COVENANTS BY EPA

66. Except as provided in Section XIX (Reservations of Rights by EPA), EPA covenants not to sue or to take administrative action against Respondent pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work, and Future Response

Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the complete and satisfactory performance by Respondent of its obligations under this Settlement. These covenants extend only to Respondent and do not extend to any other person.

## XIX.    RESERVATIONS OF RIGHTS BY EPA

67.    Except as specifically provided in this Settlement, nothing in this Settlement shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants, or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing in this Settlement shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Settlement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondent in the future to perform additional activities pursuant to CERCLA or any other applicable law.

68.    The covenants set forth in Section XVIII (Covenants by EPA) do not pertain to any matters other than those expressly identified therein. EPA reserves, and this Settlement is without prejudice to, all rights against Respondent with respect to all other matters, including, but not limited to:

      a.    liability for failure by Respondent to meet a requirement of this Settlement;

      b.    liability for costs not included within the definitions of Past Response Costs or Future Response Costs;

      c.    liability for performance of response action other than the Work;

      d.    criminal liability;

      e.    liability for violations of federal or state law that occur during or after implementation of the Work;

      f.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

      g.    liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

      h.    liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site not paid as Future Response Costs under this Settlement.

69. **Work Takeover**

a. In the event EPA determines that Respondent: (1) has ceased implementation of any portion of the Work; (2) are seriously or repeatedly deficient or late in their performance of the Work; or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to Respondent. Any Work Takeover Notice issued by EPA (which writing may be electronic) will specify the grounds upon which such notice was issued and will provide Respondent a period of 10 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b. If, after expiration of the 3-day notice period specified in Paragraph 69.a, Respondent have not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify Respondent in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this Paragraph 69.b. Funding of Work Takeover costs is addressed under Paragraph 91 (Access to Financial Assurance).

c. Respondent may invoke the procedures set forth in Paragraph 48 (Formal Dispute Resolution) to dispute EPA's implementation of a Work Takeover under Paragraph 69.b. However, notwithstanding Respondent's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under Paragraph 69.b until the earlier of (1) the date that Respondent remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a written decision terminating such Work Takeover is rendered in accordance with Paragraph 48 (Formal Dispute Resolution).

d. Notwithstanding any other provision of this Settlement, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XX. COVENANTS BY RESPONDENT

70. Respondent covenants not to sue and agrees not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Past Response Costs, Future Response Costs, and this Settlement, including, but not limited to:

a. any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b. any claims under Sections 107 and 113 of CERCLA, Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), or state law regarding the Work, Past Response Costs, Future Response Costs, and this Settlement;

c. any claim arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the State Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

71. Except as provided in Paragraph 74 (Waiver of Claims by Respondent), these covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to any of the reservations set forth in Section XIX (Reservations of Rights by EPA), other than in Paragraph 68.a (liability for failure to meet a requirement of the Settlement), 68.d (criminal liability), or 68.e (violations of federal/state law during or after implementation of the Work), but only to the extent that Respondent's claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

72. Nothing in this Settlement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

73. Respondent reserves, and this Settlement is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of Respondents' deliverables or activities.

74. **Waiver of Claims by Respondent**

a. Respondent agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have:

(1) **De Micromis Waiver.** For all matters relating to the Site against any person where the person's liability to Respondent with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

The waiver under this section shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines

that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural . resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

## XXI.   OTHER CLAIMS

75.     By issuance of this Settlement, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondent. The United States or EPA shall not be deemed a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Settlement.

76.     Except as expressly provided in Paragraphs 74 (Waiver of Claims by Respondent) and Section XVIII (Covenants by EPA), nothing in this Settlement constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Settlement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages, and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

77.     No action or decision by EPA pursuant to this Settlement shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXII.  EFFECT OF SETTLEMENT/CONTRIBUTION

78.     Except as provided in Paragraphs 74 (Waiver of Claims by Respondent), nothing in this Settlement shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Settlement. Except as provided in Section XX (Covenants by Respondent), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this Settlement diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

79.     The Parties agree that this Settlement constitutes an administrative settlement pursuant to which Respondent has, as of the Effective Date, resolved liability to the United States within the meaning of Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C.

§§ 9613(f)(2) and 9622(h)(4), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this Settlement. The "matters addressed" in this Settlement are the Work and Future Response Costs.

80.     The Parties further agree that this Settlement constitutes an administrative settlement pursuant to which Respondent has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

81.     Respondent shall, with respect to any suit or claim brought by it for matters related to this Settlement, notify EPA in writing no later than 60 days prior to the initiation of such suit or claim. Respondent also shall, with respect to any suit or claim brought against it for matters related to this Settlement, notify EPA in writing within 10 days after service of the complaint or claim upon it. In addition, Respondent shall notify EPA within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial, for matters related to this Settlement.

82.     In any subsequent administrative or judicial proceeding initiated by EPA, or by the United States on behalf of EPA, for injunctive relief, recovery of response costs, or other relief relating to the Site, Respondent shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenant by EPA set forth in Section XVIII (Covenants by EPA).

## XXIII. INDEMNIFICATION

83.     The United States does not assume any liability by entering into this Settlement or by virtue of any designation of Respondent as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), and 40 C.F.R. 300.400(d)(3). Respondent shall indemnify, save, and hold harmless the United States, its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Respondent, their officers, directors, employees, agents, contractors, or subcontractors, and any persons acting on Respondent's behalf or under their control, in carrying out activities pursuant to this Settlement. Further, Respondent agrees to pay the United States all costs it incurs, including but not limited to attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of Respondent, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Settlement. The United States shall not be held out as a party to any contract entered into by or on behalf of Respondent in carrying out activities pursuant to this Settlement. Neither Respondent nor any such contractor shall be considered an agent of the United States.

84.     The United States shall give Respondent notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Respondents prior to settling such claim.

85.     Respondent covenants not to sue and agree not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between the Respondent and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, Respondent shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Respondent and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

## XXIV. INSURANCE

86.     Respondent shall secure, and shall maintain until the first anniversary after issuance of Notice of Completion of Work pursuant to Section XXVIII (Notice of Completion of Work), commercial general liability insurance with limits of liability of $1 million per occurrence, automobile liability insurance with limits of liability of $1 million per accident, and umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits, naming EPA as an additional insured with respect to all liability arising out of the activities performed by or on behalf of Respondent pursuant to this Settlement. In addition, for the duration of the Settlement, Respondents shall provide EPA with certificates of such insurance and a copy of each insurance policy. Respondent shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. In addition, for the duration of the Settlement, Respondent shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Respondent in furtherance of this Settlement. If Respondent demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in a lesser amount, Respondent needs to provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. Respondent shall ensure that all submittals to EPA under this Paragraph identify the Site and the EPA docket number for this action.

## XXV. FINANCIAL ASSURANCE

87.     In order to ensure completion of the Work, Respondent shall secure financial assurance, initially in the amount of 5 million dollars ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA or under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. Respondent may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.

a. A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b. An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c. A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d. A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e. A demonstration by a Respondent that it meets the financial test criteria of Paragraph 88 , accompanied by a standby funding commitment, which obligates the affected Respondent to pay funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f. A guarantee to fund or perform the Work executed in favor of EPA by a company: (1) that is a direct or indirect parent company of a Respondent or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a Respondent; and (2) can demonstrate to EPA's satisfaction that it meets the financial test criteria of Paragraph 87.

88. Respondent seeking to provide financial assurance by means of a demonstration or guarantee under Paragraph 87.e or 87.f must, within 30 days of the Effective Date:

a. Demonstrate that:

(1) the affected Respondent or guarantor has:

i. Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

ii. Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii. Tangible net worth of at least $10 million; and

iv. Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

(2) The affected Respondent or guarantor has:

i. A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

ii. Tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii. Tangible net worth of at least $10 million; and

iv. Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

b. Submit to EPA for the affected Respondent or guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA or under the "Financial Assurance - Settlements" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

89. Respondent providing financial assurance by means of a demonstration or guarantee under Paragraph 87.e or 87.f must also:

a. Annually resubmit the documents described in Paragraph 88.b within 90 days after the close of the affected Respondent's or guarantor's fiscal year;

b. Notify EPA within 30 days after the affected Respondent or guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section;

c.     Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the affected Respondent or guarantor in addition to those specified in Paragraph 88.b; EPA may make such a request at any time based on a belief that the affected Respondent or guarantor may no longer meet the financial test requirements of this Section; and

d.     Financial Assurance should be mailed to the attention of Paula V. Painter, US EPA, Atlanta Federal Center, 61 Forsyth Street, S. W., Atlanta, Georgia 30303.

90.     Respondent shall diligently monitor the adequacy of the financial assurance. If any Respondent becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, such Respondent shall notify EPA of such information within [7] days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected Respondent of such determination. Respondent shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the affected Respondent, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed [60] days. Respondent shall follow the procedures of Paragraph 92 (Modification of Amount, Form, or Terms of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Respondent's inability to secure financial assurance in accordance with this Section does not excuse performance of any other obligation under this Settlement.

91.     **Access to Financial Assurance**

a.     If EPA issues a notice of implementation of a Work Takeover under Paragraph 69.b, then, in accordance with any applicable financial assurance mechanism, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with Paragraph 91.c.

b.     If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel the mechanism, and the affected Respondent fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with Paragraph 91.c.

c.     If, upon issuance of a notice of implementation of a Work Takeover under Paragraph 69.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism [and/or related standby funding commitment], whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is a demonstration or guarantee under Paragraph 87.e or 87.f, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. Respondent shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

d.      Any amounts required to be paid under this Paragraph 91 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into DAFCO Tote Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

e.      Finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

f.      All EPA Work Takeover costs not paid under this Paragraph 91 must be reimbursed as Future Response Costs under Section XIV (Payments for Response Costs).

92.      **Modification of Amount, Form, or Terms of Financial Assurance**. Respondent may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. EPA will notify Respondent of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. Respondent may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement or written decision resolving such dispute under Section 0 (Dispute Resolution). Respondent may change the form or terms of the financial assurance mechanism only in accordance with EPA's approval. Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall not be subject to challenge by Respondent pursuant to the dispute resolution provisions of this Settlement or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, Respondent shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism.

93.      **Release, Cancellation, or Discontinuation of Financial Assurance**. Respondent may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Notice of Completion of Work under Section XXVIII (Notice of Completion of Work); (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation, or discontinuance of any financial assurance, in accordance with the agreement or final decision resolving such dispute under Section XV (Dispute Resolution).

## XXVI. MODIFICATION

94.      The OSC may modify any plan or schedule in writing or by oral direction. Any oral modification will be memorialized in writing by EPA promptly, but shall have as its effective date the date of the OSC's oral direction. Any other requirements of this Settlement may be modified in writing by mutual agreement of the parties.

requested deviation until receiving oral or written approval from the OSC pursuant to Paragraph 94.

96. No informal advice, guidance, suggestion, or comment by the OSC or other EPA representatives regarding any deliverable submitted by Respondent shall relieve Respondent of its obligation to obtain any formal approval required by this Settlement, or to comply with all requirements of this Settlement, unless it is formally modified.

## XXVII. ADDITIONAL REMOVAL ACTION

97. If EPA determines that additional removal actions not included in the Removal Work Plan or other approved plan(s) are necessary to protect public health, welfare, or the environment, and such additional removal actions are consistent with Action Memorandum EPA will notify Respondent of that determination. Unless otherwise stated by EPA, within 30 days after receipt of notice from EPA that additional removal actions are necessary to protect public health, welfare, or the environment, Respondent shall submit for approval by EPA a work plan for the additional removal actions. The plan shall conform to the applicable requirements of Section 15 (Work to Be Performed) of this Settlement. Upon EPA's approval of the plan pursuant to Paragraph 0 (Work Plan and Implementation), Respondent shall implement the plan for additional removal actions in accordance with the provisions and schedule contained therein. This Section does not alter or diminish the OSC's authority to make oral modifications to any plan or schedule pursuant to Section XXVI (Modification).

## XXVIII. NOTICE OF COMPLETION OF WORK

98. When EPA determines, after EPA's review of the Final Report, that all Work has been fully performed in accordance with this Settlement, EPA will provide written notice to Respondent. If EPA determines that such Work has not been completed in accordance with this Settlement, EPA will notify Respondent, provide a list of the deficiencies, and require that Respondent modify the Removal Work Plan if appropriate in order to correct such deficiencies. Respondent shall implement the modified and approved Removal Work Plan and shall submit a modified Final Report in accordance with the EPA notice. Failure by Respondent to implement the approved modified Removal Work Plan shall be a violation of this Settlement.

## XXIX. INTEGRATION/APPENDICES

99. This Settlement and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement. The parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Settlement. The following appendices are attached to and incorporated into this Settlement:

    a.      "Appendix A" is the Action Memorandum.

## XXX.  EFFECTIVE DATE

100.      This Settlement shall be effective 3 days after the Settlement is signed by the
Regional Administrator or his/her delegate.

**Signature Page for** Settlement Regarding **the DAFCO Totes Site**

IT IS SO AGREED AND ORDERED:

**U.S. ENVIRONMENTAL PROTECTION AGENCY:**

Date: 05/24/2019

James W. Webster, Ph.D., Chief
Emergency Response, Removal, Prevention and
Preparedness Branch
Superfund & Emergency Management Division, Region 4
U.S. EPA

Date: 5/23/19

Maurice L. Horsey, IV, Chief
Enforcement Branch
Superfund & Emergency Management Division, Region 4
U.S. EPA

Signature Page for Settlement Regarding DAFCO Totes Superfund Site

FOR

Tailored Chemicals Products, Inc

_05/03/19_
Dated

_____
Jack Temple, III
President
Tailored Chemical Products, Inc.
700 12th Street Drive, NW
Hickory, N.C. 28601