IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:21-CV-00069-KDB-SCR

| | |
|---|---|
| TAILORED CHEMICAL PRODUCTS, INC., **Plaintiff,** v. KISER-SAWMILLS, INC.; CENTER FOR APPLIED RENEWABLE RESOURCES AND ENERGY INC.; THOMAS J. MCKITTRICK; ECO-TOTE CONTAINER SERVICES, LLC; BRENNTAG MID-SOUTH, INC.; DONALD E. BARRIER, II; DAFCO INC.; ELIZABETH B. KEISTER; PERRY R. KEISTER; AND ANDERSON FAMILY PROPERTIES, LLC, **Defendants.** | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** is before the Court for a decision on the merits following a three day

bench trial and the parties' post-trial submissions. Plaintiff Tailored Chemical Products, Inc.

("TCPI") claims that it is entitled to contribution from the Defendants under CERCLA to defray a

portion of the more than $7 million in disposal costs it incurred to clean up several thousand 275-

gallon wastewater "totes" at a property owned by Anderson Family Properties ("AFP") in Hudson,

North Carolina (the "Disposal Site"). All of the remaining Defendants, with the exception of Kiser

Sawmills, Inc. ("KSI"), are "potentially responsible parties" under 42 U.S.C. § 9607(a); therefore,

1

the Court's task is to allocate TCPI's response costs among the parties "using such equitable factors as the court determines are appropriate." *See* 42 U.S.C. § 9613. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court's findings of fact, conclusions of law and Judgment are set forth below.

Aside from the general finger pointing typical of CERCLA cases, the parties broadly agree on what happened here. TCPI is a glue manufacturer that generated wastewater which was put into large plastic collection totes. TCPI entered into an oral agreement with DAFCO, Inc. to treat the wastewater and clean the totes, which were then sent to DAFCO's facility in Lenoir, North Carolina that was located in a building owned by KSI. DAFCO failed to do its job and stopped paying rent to KSI so the totes were moved to the Disposal Site, to which more TCPI totes were sent and where DAFCO similarly failed to dispose of the wastewater or clean the totes. Ultimately, after thousands of totes piled up (and DAFCO again fell behind on the rent), state and federal regulators ordered the totes to be tested, which found the presence of hazardous waste in contents "aggregated" from several totes. The EPA then ordered all the totes removed, and TCPI solely bore the costs of removal. Also, there seems to be a consensus on another point – everyone says they thought the TCPI wastewater was non-hazardous and there is little more than speculation as to how any "hazardous" waste came to be found. So, while the totes obviously became a mess (in both Lenoir and Hudson), no one thought they were a potentially *dangerous* mess until the regulators ordered the cleanup.

In such unusual circumstances, which in the Court's view minimizes the "culpability" of all those involved, the Court is left with fashioning an equitable allocation primarily out of considerations of the role each party played in the relevant events, the benefits each received and

2

their respective financial circumstances. Taking into account those factors and others, the Court will (in the absence of any evidence that DAFCO, a dissolved entity, can contribute) allocate TCPI's response costs mostly to TCPI (92%) with much smaller shares allocated to Defendants AFP (6%), Perry Keister (1%) and Elizabeth Keister (1%).

## I.     FINDINGS OF FACT

### A.    This Action, the Parties and the Trial

1.      This is a civil action for contribution brought by Plaintiff TCPI pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §9613, against Defendants DAFCO, AFP, KSI, Perry R. Keister ("Perry K"), Elizabeth B. Keister ("Elizabeth K"), Donald E. Barrier II ("Barrier"), Eco-Tote Container Services, LLC ("Eco-Tote"), Thomas J. McKittrick ("McKittrick"), Brenntag Mid-South, Inc. ("Brenntag") and the Center for Applied Renewable Resources and Energy, Inc. ("CARRE") for costs and damages incurred by TCPI at the Disposal Site, 2698 Hickory Boulevard in Hudson, North Carolina. AFP brought a third party complaint for CERCLA contribution against Southern Resin Inc. ("SRI").

2.      Several of the Defendants have been dismissed, released, defaulted or died. The Court granted Mr. McKittrick's Motion to Dismiss on February 4, 2022 (Doc. No. 143). Plaintiff settled with Brenntag and filed a Stipulation of Dismissal on April 28, 2023 (Doc. No. 169). Plaintiff settled with Eco-Tote and a related Stipulation of Dismissal was filed on September 13, 2023 (Doc. No. 239). The Court entered Default against DAFCO on July 3, 2023 (Doc. No. 191). Plaintiff announced in open court that it was not pursuing claims against CARRE. Finally, Mr. Barrier passed away on July 10, 2023, and Plaintiff is no longer asserting claims against him.

3

3. Accordingly, the remaining non-defaulted Defendants are AFP, KSI, Perry K, Elizabeth K and Third Party Defendant SRI.

4. The Court held a bench trial on September 18, 19 and 21, 2023. TCPI, AFP, Perry K, KSI and SRI appeared and were represented by counsel. Elizabeth K and DAFCO did not appear and were not represented by counsel at trial. Approximately 34 exhibits were admitted (some consisting of a series of documents and thousands of pages). Seven witnesses testified, including one expert witness.

5. TCPI is a North Carolina corporation with its principal place of business in Catawba County, North Carolina. Earl Jackson Temple, III ("Temple") was at all relevant times the president of TCPI. T.23

6. DAFCO was a North Carolina corporation with its principal place of business in Caldwell County, North Carolina. North Carolina Secretary of State records show DAFCO was formed on August 12, 2009 by Elizabeth Keister. DAFCO was administratively dissolved on November 16, 2016, and has never made an appearance in this matter.

7. AFP is a North Carolina Limited Liability Company with its principal place of business in Caldwell County, North Carolina. Dandridge Anderson ("Anderson") is AFP's registered agent and managing member and is a citizen and resident of Caldwell County, North Carolina. AFP owned the Disposal Site located at 2698 Hickory Boulevard, Hudson, North Carolina.

8. Perry R. Keister is a citizen and resident of Caldwell County, North Carolina. Perry K worked in and was experienced in the fields of wastewater management and permits and worked for TCPI as a consultant for several years starting in 2008. T.439:9 - 442:14.

4

9. Elizabeth Keister was a resident of the State of North Carolina and was the president and registered agent of DAFCO. Elizabeth K, who is Perry K's daughter, T.442, has not made an appearance in this matter.

10. Donald E. Barrier, II was a citizen and resident of Caldwell County of North Carolina and the General Manager of DAFCO. T.440:25-441:5.

11. Eco-Tote Container Services, LLC, was a North Carolina Limited Liability Company formed on January 21, 2016. Eco-Tote was a successor in interest to DAFCO via an asset purchase agreement T.424, TCPI_E.17. Eco-Tote was dissolved with the filing of the Articles of Dissolution executed on April 20, 2018, by Manager Thomas J. McKittrick, with an effective date of dissolution of December 31, 2017.

12. Defendant Thomas J. McKittrick is a resident of Mecklenburg County, North Carolina and was the owner of Eco-Tote. T.423-424.

13. Defendant Brenntag Mid-South, Inc. is a foreign business corporation authorized to conduct business in North Carolina.

14. Kiser- Sawmills, Inc. is a corporation organized under the laws of the State of North Carolina with an office and place of business in Lenoir, Caldwell County, North Carolina. KSI owned the real property at 439 Virginia Street, Lenoir, NC (the "Virginia Street Property"). Mark Kiser is the President of KSI. T.303:7-16.

15. Defendant CARRE was a corporation organized under the laws of the State of North Carolina that was owned by Perry K. CARRE leased the Virginia Street Property from KSI then subleased it to DAFCO. T.444:16-445:20. CARRE's registration was suspended on October 13, 2017.

5

16. Third Party Defendant Southern Resin, Inc. ("SRI") is a corporation organized under the laws of the State of North Carolina with its principal place of business in Thomasville, North Carolina and is a sister company of Plaintiff. T.103-104. Temple was the president of SRI. T.137-138.

B. TCPI's Wastewater

17. TCPI operates three facilities in the Town of Hickory, another facility in Conover in Catawba County and other unrelated facilities outside North Carolina. T.24.

18. TCPI manufactures and sells commercial and industrial adhesives, including hot melt adhesives, white glues, and pressure sensitive adhesives, urethane adhesives and other specialty chemicals. T.24-25. TCPI delivers glue and other products to customers, including Elmer's Glue, in 275-gallon totes, tanker trucks and 55-gallon drums. T.25. Its sister company SRI manufactures chemical resins. T.105.

19. TCPI transports 25% of its product, including its adhesives, in 5,000-gallon tank trucks. Of the remaining 75% of its product, 75% is shipped in 275-gallon totes, with the remaining shipped in 55-gallon drums or 5-gallon pails. These totes consist of a plastic tote bladder with a steel frame. T.25.

20. In the course of manufacturing and distributing its products, TCPI generates glue wastewater. This wastewater includes wash water, which is the material that's used to wash out Plaintiff's mixers or to wash out tank trucks. Wastewater also includes materials captured in floor drains from glue spills. T.101. During the relevant time periods, wastewater that was not treated and discharged by TCPI was put into 275-gallon totes for later disposal by third parties. T.26-27.

6

21.     TCPI currently processes about one-half the wastewater internally and discharges the treated wastewater to the Town of Hickory. The other half is taken by vendors who pump and haul the wastewater to their facilities for treatment. Vendors now used by TCPI include Shamrock Environmental, Zebra Environmental and Greenway. T.25-26. TCPI pays 23 cents to 25 cents per gallon to third party vendors to treat its glue wastewater. T.27.

22.     During the relevant period, Plaintiff used a chemical containing small amounts of tetrachloroethylene, or "PCE," in its manufacturing processes. T.42; T.66. However, prior to the testing conducted in connection with the cleanup of the Disposal Site, no testing had shown the amount of PCE in TCPI's wastewater or that wastewater totes exceeded EPA limits. Therefore, TCPI reasonably believed that its wastewater was non-hazardous based on testing done by the City of Hickory and other testing and listed it as such when it was transported for treatment and disposal. T.111, 132, 143-146.

C.      TCPI's Agreement to Send Wastewater to DAFCO

23.     In 2008, in coordination with the Town of Longview, TCPI obtained a Community Development Block Grant. A portion of the grant was used to construct a new sewer line connecting TCPI to the Town of Longview sewer system. T.30.

24.     A condition of the Community Development Block Grant was that TCPI install an industrial pretreatment system. T.30.

25.     In 2008, TCPI hired ESCO through its employee Perry K to design and install a system to pretreat industrial wastewater from Tailored Chemical's Longview plant prior to discharging to the Town of Longview Sewer System. T.28-29. Perry K was recommended to TCPI by the City of Hickory. T.29.

7

26. Perry K designed and helped install a pretreatment system for TCPI at its Longview plant. T.31.

27. In January 2009, TCPI experienced a catastrophic fire at its Longview plant which resulted in a total loss of the main manufacturing building. T.32.

28. For a period of time after the fire TCPI could not operate its industrial pretreatment system and accumulated wastewater in 275-gallon totes, which were stacked in the parking lot at the Longview facility. T. 33.

29. Eventually, TCPI started operating on a limited basis, including discharging treated wastewater to the Town of Longview's sewer system. T. 34.

30. After TCPI began discharging again, the Town of Longview dug up and capped the sewer line connecting TCPI to the Longview system. T. 35.

31. In 2009, TCPI sued the Town of Longview because the Town cut off TCPI's access to the public sewer, *Tailored Chemical, Inc. v. Town of Long View et al.*, Civil Action No. 5:10-cv-00174, United States District Court for the Western District of North Carolina, Statesville Division. T.36. As a result of the litigation, TCPI's access to the sewer system was restored. T.37.

32. Perry K testified as an expert witness for TCPI in the litigation against the Town of Longview, T.36-37, then when TCPI eventually moved the industrial pretreatment system to its plant number 2 on Tate Boulevard in Hickory, T.37, Perry K assisted TCPI in obtaining an industrial wastewater discharge permit from the Town of Hickory. T.37.

33. Perry K testified that he was told by TCPI that there were no hazardous chemicals in TCPI's wastewater. T.439. He further testified that during his work at TCPI, he only tested treated wastewater and did not test untreated wastewater. T.439.

8

34.     During the time TCPI was cut off from the Town of Long View sewer system, TCPI also accumulated wastewater in 275-gallon totes at the Longview Facility. T.38.

35.     In 2009, Perry K., who was facing marital difficulties, left his position as an employee and partial owner of ESCO (which was owned 95% by his wife) and began to work with DAFCO, a company owned by his then 18 year old daughter, Elizabeth K, who had also been working at ESCO. T.39, 451, 455, 478.

36.     While Perry K was careful not to become a formal owner, executive officer or W-2 employee of DAFCO, the Court finds that he was an integral part of DAFCO and had actual and apparent authority to act on DAFCO's behalf, especially in relation to DAFCO's dealings with TCPI. Perry K acknowledged that he served as "chief technical officer" for the company, arranged for DAFCO to sublease its operating facility in Lenoir from CARRE (which Perry K owned), used his previous working relationship with TCPI to suggest that TCPI use DAFCO to treat/clean its wastewater/totes and was the "primary representative" in DAFCO's dealings with TCPI. Indeed, Mr. Temple testified that Perry K represented himself to be the "head man in charge" of DAFCO, notwithstanding his then teenage daughter's title of President. T.39, 162-163, 479-482.

37.      Further, the Court finds that Perry K benefited personally through his efforts on DAFCO's behalf related to the TCPI totes, including DAFCO obtaining over $1 million (as discussed below) which was spent in part on rent that would have otherwise had to have been paid by CARRE, a company owned by Perry K;  the success of DAFCO providing an entity through which he could obtain work and avoid income in connection with his (former) wife's company; and supporting a company where his daughter could have the title of President.

9

38.     In 2009 or 2010, Perry K. told TCPI that he was moving to DAFCO, which was to be a "commercial tote reconditioner and wastewater treatment company." Perry K then solicited TCPI's interest in working out an arrangement for DAFCO to clean the totes that had accumulated at Longview. In Perry K's words, he "suggested to Mr. Temple that DAFCO could do it." T.38-39, 481-482.

39.     Based on Perry K's knowledge of TCPI's operations and wastewater and his representation that DAFCO "could do it," TCPI entered into an oral agreement that DAFCO would treat the wastewater in the totes for $.15 per gallon. TCPI also agreed to pay DAFCO approximately $45 for totes that were cleaned and returned to TCPI. TCPI did not pay or receive any payment for the delivery of "empty" totes, which often had a small amount of product residue inside. T.39-41, 141.

D.     The Movement of Totes from TCPI to KSI's Lenoir Building to the Disposal Site

40.     As of 2010, KSI owned a large commercial/industrial property at 439 Virginia Street in Lenoir, North Carolina (the "Virginia Street Property"). T.303.

41.     In 2011, a business associate of Perry K (Mr. Cone) and Perry K agreed to rent and potentially purchase the Virginia Street Property for use by CARRE through a Commercial Lease with Option to Purchase. T.444, 468, 488. At the time, CARRE built SIP panels for construction purposes. T.445-446. In turn, Perry K arranged for CARRE to sublease portions of the property to DAFCO to treat wastewater, for which DAFCO had received a permit. T.445, 448-450.   KSI testified that they did not give CARRE permission to sublease a portion of the property to DAFCO; however, after they learned of the sublease (as well as the nature of DAFCO's business), KSI allowed DAFCO to remain on the premises and accepted rent paid directly from DAFCO.

10

42.     Beginning in 2011, TCPI shipped totes containing wastewater to DAFCO's facility on Virginia Street in Lenoir. T.41, 216-217. Most of the totes were delivered on TCPI trucks with some of the totes delivered on Southern Resin trucks. T. 41. Neither TCPI nor DAFCO kept track of what happened to individual totes so, beyond the aggregate numbers discussed below, there is no evidence as to which totes were cleaned, returned to TCPI and/or transferred from Lenoir to the Disposal Site. Nor did TCPI or DAFCO test the contents of any of the totes, again because all parties believed that the wastewater was non-hazardous. T.40, 143.

43.     Some of the wastewater totes that were moved to the Virginia Street Property were in disrepair and were sun damaged because they had been sitting outside for a long period of time. It proved difficult to remove all of the solids which had collected in the bottom of some of the totes. T.458-459, 464.

44.     DAFCO treated the wastewater in some of the totes and returned some cleaned and washed totes to TCPI. T.41, 42.  It costs approximately $200 to $250 for new totes and $75 to $150 for reconditioned totes so it was advantageous to have totes cleaned and returned for $43. T.99. However, Mr.  Temple testified that TCPI was not getting an equal amount of totes back that it sent out. T.102.

45.     Between 2011 and 2014, TCPI shipped approximately 16,800 totes to the Virginia Street Property. Doc. No. 223. Between 2011 and 2014 DAFCO returned approximately 9,600 totes from the Virginia Street Property to TCPI. Doc. No. 223. There was no specific evidence presented to the Court on how much TCPI paid DAFCO for taking the wastewater or cleaning these totes. Conservatively assuming that the totes shipped to DAFCO contained an average of 200 gallons of wastewater (because a number of "empty" totes were sent to DAFCO only for

11

cleaning) and DAFCO was paid $43 each for the returned totes, TCPI paid DAFCO more than $900,000 for its services from 2011 to 2014. T.53. From December 2014, through February 2016, TCPI paid DAFCO $155,165.82 for treating wastewater and cleaning totes. T.59.

46.     In September 2011, the Virginia Street Property was inspected by the North Carolina Department of Environment and Natural Resources, Division of Waste Management ("NCDENR"). Perry K informed NCDENR that "the company" cleaned totes for TCPI, with the contents being either soap or water-based such as Elmer's PVA glue. NCDENR did not identify any potentially hazardous materials at that time. AFP Exhibit 11(29).

47.     Although CARRE was initially responsible for paying rent to KSI for the Virginia Street Property, by the middle of 2012 Perry K had asked DAFCO to "take over the rent." T.446-447. DAFCO then began paying rent directly to KSI.  KSI was informed that DAFCO cleaned totes containing non-hazardous water-based residue for TCPI and returned the totes to TCPI and accepted the rent from DAFCO. T.489-490. However, when KSI requested that DAFCO sign a lease, DAFCO refused. T.490-49. Also, despite options to do so and related discussions, neither CARRE nor DAFCO ever purchased the Virginia Street Property. T.468.

48.     CARRE, Perry K and DAFCO paid rent at various times in 2012-2014, but significantly less than was required under the governing lease. Collectively, KSI received more than $30,000 in rent during DAFCO's tenure at the Virginia Street Property. TCPI Ex. 11-43, T.319-320.

49.     After CARRE and DAFCO stopped making lease payments,  T.319-320, KSI initiated a lawsuit in December 2013 in Caldwell County, North Carolina against Perry K, CARRE, Dafco, Elizabeth K, and Barrier regarding the unauthorized use and trespassing on the

Virginia Street Property ("Caldwell Eviction Action"), which included: (1) Action for Ejectment Pursuant to N.C.G.S. §42-26(a)(2), (2) breaches of contract; (3) unfair and deceptive trade practices and (4) piercing the Corporate Veil. KSI Exhibit 1.

50. The Caldwell County Superior Court twice ordered that Defendants vacate the premises, which was to have occurred by July 11, 2014. *See* KSI Exhibit 4; T. 305, 470-472.

51. During this time, TCPI was informed that there was a need to move the totes from Virginia Street (T.176-179) and Mr. Temple went to Virginia Street and saw thousands of totes at the Virginia Street Property. T.61-62.

52. DAFCO ceased operations at the Virginia Street property in 2014. Doc. No. 223. Needing to move DAFCO's operations (and its inventory of thousands of totes from TCPI), DAFCO sought a new location in 2014, and Elizabeth K contacted AFP about leasing the "back building" on its property to build and fabricate water systems.

53. Prior to leasing the property, AFP's Anderson came to meet with TCPI in Hickory. Mr. Anderson told TCPI that AFP had an opportunity to lease out some of his building to DAFCO, and that DAFCO was representing that TCPI was one of his biggest customers. Mr. Temple told Anderson that TCPI had been doing a lot of business with Perry K and DAFCO and would continue to do so if DAFCO could get its permits to treat wastewater. The meeting lasted approximately 30 to 45 minutes. T.44.

54. Temple and Anderson met again later to discuss helping DAFCO get a permit to treat wastewater and possibly a grant from the state of North Carolina so DAFCO could purchase equipment to assist with the treatment of wastewater. T.46, 47.

55.     DAFCO signed a lease with AFP in June 2014 for a portion of the back building of the Disposal Site. T. 350, AFP Ex. 25. Then, in early 2015, AFP and DAFCO entered into a second lease extending the time period of the lease and the scope of the lease to include the entire back building. AFP Ex. 26. Later, in March 2015, Elizabeth K and Mr. Anderson discussed using an additional 100ft x 180ft outside section of the property for the totes, but it was never formally added to the lease and no additional rent was paid for the space.

56.     Mr. Anderson did agree that DAFCO could use the "wash bay" at the end of the building to process the totes. In connection with this discussion, Elizabeth K represented to Mr. Anderson that DAFCO had permission from the state to do its tote processing. Further, Mr. Anderson told Elizabeth K that he didn't want anything hazardous brought on the property. However, AFP did not ask DAFCO for copies of any state approvals (as TCPI similarly failed to do). T.353-354.

57.     DAFCO vacated the Virginia Street facility in 2014. After DAFCO vacated the Virginia Street facility, KSI, pursuant to an agreement with Perry K, arranged for Marx Industries to move approximately 8,000 wastewater totes from the Virginia Street Property in Lenoir to the Disposal Site. T. 307, TCPI Ex. 11-43 at ¶¶ 85-92.  KSI did not know or believe that the totes contained hazardous material.  T.465, 496-497. Mark Kiser was president of both KSI and Marx Industries when the totes were transported from the Virginia Street facility in Lenoir to the DAFCO Tote site. T.303 and 306.

58.     KSI incurred costs of $81,412.78 in moving the wastewater totes from the Virginia Street Property in Lenoir to the Disposal Site and later sought to recover those costs in litigation. TCPI Ex. 11-43 at ¶ 90; T.320-321, 499. In September 2015, KSI entered into Settlement

Agreements with Perry K, Elizabeth K, Dafco and CARRE to resolve their liability for unpaid rent and the costs of moving the totes. T. 456-457; KSI Exhibit 5. Perry K, Elizabeth K, DAFCO and CARRE did not perform the Settlement Agreement. T. 473.

59.     On January 7, 2015, Ken Rhame (USEPA Region 4), Deb Aja (North Carolina Department of Environmental Quality, Solid Waste), Kenneth Teague (Caldwell EM), Linda Wiggs (North Carolina DENR Water Quality), Brent Burch (HWS) and Ernest Lawrence (Environmental Senior Specialist) inspected the Virginia Street Property and generated a "Hazardous Waste Section Activity Report" ("Virginia Street EPA Report") T.493-495, AFP Exhibit 11(29).

60.     As set forth in the Virginia Street EPA Report, the EPA was aware that DAFCO left and abandoned approximately 4000 totes, as well as 5- and 55- gallon drums. KSI, through Marx, cooperated with the EPA to remedy the Notice of Violation. T.495-496.

61.     In the Virginia Street EPA Report, the EPA noted that on January 28, 2015, there was "an inspection of Dafco at its new location", and that DAFCO had made waste determinations of unknown containers of chemicals observed during the complaint investigation on Virginia Street, that the 5- and 55- gallon drums "had been transported to the Hudson facility" and some of the "unlabeled 5- and 55- gallon containers at Virginia Street belonged to Don [Barrier]…had been identified and labeled as non-hazardous. A portion of these were shipped to Hudson and were observed on the loading dock during the inspection on January 28, 2015. An inventory log was made available."  AFP Exhibit 11(29). The EPA did not criticize the transport of the totes from the Virginia Street Property to the Disposal Site; however, at that time no testing of the DAFCO

15

totes had been conducted. KSI did not rely on the EPA report in transporting the totes because the movement of the totes began before the report was issued.

62.     On December 8, 2016, KSI filed a second Complaint in Caldwell County Superior Court with file number 16 CVS 1477 naming DAFCO, CARRE, Impletera, LLC, Perry K, Elizabeth K, Barrier and Michael W. Sanders as defendants ("Second Caldwell KSI Action") T. 473-474.  Perry K and Elizabeth K confessed to judgment in the Second Caldwell KSI Action. Tr. 474:2– 475:8, *See* KSI Exhibits 11 and 12.

63.     Kiser-Sawmills sold the Virginia Street Property on January 20, 2017.

The Accumulation of Totes at the Disposal Site and Cleanup

64.     It took six months to fully move the wastewater totes from the Virginia Street Property to the Disposal Site. TCPI Ex. 11-43 at ¶ 92.

65.     Mr. Anderson saw totes coming to the Disposal Site beginning in January 2015, although there "weren't very many" at first. T.355. Also, he was at the property in March to discuss expanding the lease. He testified that because he was busy enjoying his retirement that "it was June when I really saw the number of totes that were there and I couldn't believe it." There is no evidence that the property became inaccessible at any time nor did DAFCO do anything to hide the continued accumulation of thousands of totes on the property. Thus, the Court finds that in allegedly not discovering the ongoing transfer of totes for several months, AFP failed to reasonably monitor its property or exercise due care as a landlord. Further, even after AFP learned of the number of totes, AFP never took any action to evict DAFCO from the property, although it did ultimately tell DAFCO and TCPI to stop bringing totes on to the property. T.359.

16

66.     DAFCO paid AFP $63,597 in rent from June 2014 until it vacated the AFP property in October, 2015. T.365-366.

67.     At the direction of DAFCO, TCPI began sending totes to the Disposal Site after DAFCO moved to that location. T. 43, 216-217. The totes were delivered to the property both by TCPI and SRI. As noted, the accumulation of thousands of untreated totes at the Disposal Site was obvious, but TCPI continued to bring additional totes to the property until approximately January 2016. AFP Exhibit 4. Thus, the Court finds that despite its agreement with DAFCO to treat the wastewater and clean the totes, it should have been clear to TCPI that in practical effect it was simply dumping additional totes onto the Disposal Site in 2015.

68.     TCPI is unaware of any bills of lading indicating that DAFCO received totes from any other businesses other than TCPI, SRI or Elmer's Glue (TCPI's customer which sent some totes directly to DAFCO). T.141. Based upon the bills of lading, SRI delivered a total of 442 totes which were "dirty"/ "empty" and 72 totes which contained wastewater. AFP Exhibit 18a-m. Elmer's Glue delivered a total of 51 totes which were "dirty"/ "empty" and 103 totes which contained wastewater. AFP Exhibit 3b-h.

69.     At some point, Mr. Temple and Mr. Anderson met after the thousands of totes were moved to the Disposal Site to discuss AFP's desire to remove the totes from the property. TCPI refused to accept responsibility for the totes, which it contended were no longer its property after delivery to DAFCO. T. 47.

70.     In February 2016, DAFCO sold its operations to Eco-Tote. T.360-61. DAFCO removed some totes from the Disposal Site to Eco-Tote's property in Mt. Holly. TCPI Exhibit 17;

T.361-362. In connection with Eco-Totes purchase of DAFCO's assets, Eco-Tote retained Elizabeth K to manage Eco-Tote's operation. T.429.

71.     The Asset Purchase Agreement between DAFCO and Eco-Tote dated February 22, 2016, Schedule 1.2(b) includes the following language:

> Taylor [sic] Chemical Products ("TCPI") has delivered to Seller's location in Hudson, NC, approximately 6,000 totes. TCPI has previously paid Seller [DAFCO] for the wastewater treatment of the liquid in these totes. It is the intent for the Buyer to transport the totes to its new facility, process the wastewater and earn the cleaning and demolition fees from TCPI.

72.     In December 2016, Mr. Temple, Mr. Anderson, Tom Stanek and Jack Temple, Jr. (Mr. Temple's father) met with McKittrick and Perry K at the Reventure Park in Belmont, North Carolina to discuss Eco-Tote's treatment and washing of totes from the Disposal Site. The meeting lasted approximately three hours. T. 50-51.

73.     Tom McKittrick told the group that Eco-Tote could treat the glue wastewater and that Eco-Tote had a pyrolysis machine, which could take the solids out of the glue totes and burn them. T.51.

74.     There were approximately 1,000 totes on the Eco-Tote Site at the time the meeting occurred. T. 51. TCPI agreed to pay Eco-Tote to treat wastewater and for clean, returned totes and began sending totes to Eco-Tote. T.54.

75.     The wastewater in the totes was treated and clean totes were returned to TCPI. T. 54. Eco-Tote ultimately realized that it was unprofitable to treat and clean the totes for TCPI and instructed TCPI to stop sending totes. T.54 TCPI shipped totes to Eco-Tote only until September 2016. T.54, 425.

18

76. The totes continued to sit at the Disposal Site. After hearing from TCPI that Eco-Tote would not return calls, AFP contacted the North Carolina Department of Environmental Quality ("NCDEQ") in March 2017, to see if they could help AFP with the totes on the property. T.363-364. In April 2017, AFP met with the NCDEQ to inquire as to what they could do to help and were told that AFP needed to do something with the totes. T.364.

77. In May 2017, AFP sued TCPI in Caldwell County Superior Court, Anderson Family Properties, LLC v. Tailored Chemical Products, Inc. 17 CVS 592 Caldwell County Superior Court, seeking removal of the wastewater totes. T. 57, 367.

78. On July 5, 2017, a warning citation was issued to AFP by the Town of Hudson to abate the number of totes on the property with a response deadline of August 5, 2017. AFP responded only by advising the Town that it had begun litigation. The Town sent a follow up Citation on March 8, 2018. Again, AFP responded on March 29, 2018, advising of the situation but taking no active steps to remove the totes. AFP Exhibit 8.

79. On May 10 and May 11, 2018, the North Carolina Division of Waste Management made a site inspection and required that AFP secure the site with protective barriers and fencing. AEP Exhibit 7. AFP retained STAT Incorporated and incurred costs for this response in the amount of $19,938.18. T.373; AFP Exhibit 2. AFP, primarily Mr. Anderson, thereafter maintained the berms. T.373-374, 398. Additionally, during the May 11th inspection, the AFP was told to remove 5 and 55-gallon drums and containers belonging to DAFCO. T.379; AFP Exhibit 7. AFP worked collaboratively with NCDEQ and Perry K to appropriately identify and appropriately dispose of the materials. T.379. AFP paid for the transportation costs associated with the removal of the 5

19

and 55-gallon containers. T.379. Also, in May 2018, AFP received a Notice of Violation ("NOV") from the City of Lenoir and responded to the same. AFP Exhibit 9.

80. On May 25, 2018, Caldwell County officials made an emergency response call to NCDEQ regarding the Disposal Site. Their Hazmat team responded, resulting in expenses incurred by AFP in the amount of $5,383.81. T.385; AFP Exhibit 2.

81. The Hazardous Waste Section within the NCDEQ then issued a NOV to TCPI and AFP for the DAFCO tote site on May 31, 2018, specific to the questionable 5 and 55-gallon containers located on the property. AFP Exhibit 7. The NOV required an assessment and inventory of the material in the identified containers at the DAFCO tote site and mandated the immediate removal of said containers from the property. As noted, AFP worked collaboratively with NCDEQ and Perry K to appropriately identify and dispose of the materials. TCPI did not participate in the response to this NOV. AFP Exhibit 7.

82. On August 2, 2018, AFP and TCPI received another NOV from the NCDEQ Division of Waste Management that required a plan of action, including testing of the material, to be submitted by September 6, 2018. AFP Exhibit 7. Mr. Anderson met with NCDEQ representatives in Asheville, NC, to discuss a plan Anderson developed. The representative informed Anderson that it had to be filed jointly with TCPI. T.386.

83. On August 23, 2018, following several days of hearing at a bench trial, Judge Eric Levinson found that at least 65% of the totes on the AFP property belonged to Tailored Chemical and required Tailored Chemical to remove 65% of the totes within 12 months. TCPI Ex. 4.

84. Judge Levinson's Order also found, *inter alia*, that Tailored Chemical shipped a total of 429 totes to Eco-Tote Container Services at the Disposal Site; that Kiser-Sawmills

20

delivered several thousand totes to the DAFCO tote site; that Eco-Tote transported some 1,000 totes from the DAFCO tote site to the Eco-Tote site; that Tailored Chemical shipped some 4,333 totes to the DAFCO tote site; that 2,457 of the totes contained wastewater and 1,875 totes were empty and just needed cleaning. TCPI Ex. 4.

85.     Tailored Chemical paid DAFCO in full for treatment of all wastewater sent to the DAFCO locations in Lenoir and at the Disposal Site. TCPI Ex. 4.

86.     No appeal was taken from Judge Levinson's order by AFP or TCPI. T.61.

87.     Following Judge Levinson's Order and the August NOV from NCDEQ, TCPI made plans to remove the totes from the AFP property including the purchase of a 5,000-gallon vacuum truck and sampling of 20 random totes on site. T.65.

88.     Also, rather than work together on a plan for NCDEQ, TCPI believed that it was more familiar with testing than AFP (which had no experience with respect to environmental testing) and said that it would submit the plan to NCDEQ. TCPI engaged an environmental consultant, David Hayne, to prepare a further sampling plan, which he submitted to NCDEQ on September 6, 2018, without supplying a copy to AFP. T.386-387. However, the plan was not approved by NCDEQ. T.67.

89.     NCDEQ rejected TCPI's testing plan because it was only testing halfway down into the liquids on top. The state required that all materials from top to bottom, including the solids, needed to be tested using a coliwasa tube. T.67, 152, 155, 272. Mr. Temple argued to the NCDEQ that such testing was unnecessary because it was all non-hazardous. T.152.

90.     On October 2, 2018, Anderson and Temple met with NCDEQ representatives at the site. Considerable discussions were had regarding the testing of the contents of the totes. Doc. 223.

21

Ultimately, samples taken by TCPI were analyzed by a commercial laboratory. The sample results were shared with the Hazardous Waste Section within the North Carolina Department of Environmental Quality ("NCDEQ"). T.66

91.     On January 30, 2019, DEQ advised AFP and TCPI that it had received and reviewed the analytical data of a "composite" sample taken of material collected from 20 totes at the Disposal Site. The analytical data identified the presence of tetrachloroethylene ("PCE") at 2.07 milligrams per liter (mg/l). The results exceeded the RCRA regulatory level of 0.7 mg/l thus suggesting that some of the totes on site contained hazardous waste. T.66, 68; TCPI Exhibit 2. This was the first time any of the parties learned that the totes on the property contained hazardous waste. T.389. Neither the parties nor any expert witness has offered an explanation, beyond speculation relating to the amount of time the wastewater sat in the totes or the mixing of wastewater, as to how a hazardous level of PCE came to be found in some of the totes.

92.     After the NCDEQ disapproved of TCPI's testing methodology, Mr. Temple characterized it as a "stalemate" for months.  T.66.  The NCDEQ ultimately determined the site needed immediate action and referred the site to the State Superfund Program, which on April 3, 2019, referred the site to US Environmental Protection Agency ("USEPA") to do a Removal Site Evaluation (RSE) T.390-391.

93.     In April 2019, Mr. Temple received a call from Ken Rhame with the United States Environmental Protection Agency ("EPA"). T.68, which promptly led to a meeting among Mr. Temple, Mr. Stanek, Mr. Anderson, and Mr. Rhame at the Disposal Site. T.232.

94.     Mr. Rhame directed AFP and TCPI to begin cleaning up the wastewater totes at the Disposal Site immediately. They contacted Gary Sparks of STAT, who came to the Site the same

afternoon. T. 70. AFP incurred costs paid to STAT in the amount of $32,848.68 at the beginning of the removal. T.385, 392; AFP Exhibit 2.

95.     On May 3, 2019, TCPI entered into an Administrative Settlement Agreement and Order on Consent for Removal Action with the United States Environmental Protection Agency, styled, In the Matter of the DAFCO Tote Site, 2698 Hickory Boulevard, Hudson, North Carolina 28638, Tailored Chemical Products, Respondent. CERCLA Docket No. 04-2019-9998. ("AOC") TCPI Ex. 1. AFP refused to be a party to the AOC because it didn't believe it was responsible for the totes and did not have the necessary funds to support the anticipated costs of cleanup. T.393.

96.     TCPI testified that it agreed to clean up the site because the EPA "was holding a pretty big gun to (its) head" by saying that if EPA was forced to fund the cleanup it could cost upwards of $10-$20 million. T.196-197.

97.     The AOC required TCPI to analyze, remove and properly dispose of all of the material in the totes on the AFP property including wastewater totes that did not have legible labels. TCPI Exhibit 1.

98.     The AOC included Findings of Fact and Conclusions of Law regarding the totes remaining on the DAFCO Tote Site. The AOC concluded, as a matter of law, that the DAFCO Tote Site was a facility as defined in Section 101(9) of CERCLA, that the contamination at the DAFCO Tote Site included a hazardous substance as defined in Section 101(14) of CERCLA, that there was an actual or threatened release of a hazardous substance from the facility, that the conditions at the site constituted an imminent and substantial endangerment, and the removal action was necessary to protect the public health or environment. TCPI Ex. 1. ¶ 10 a. g., T.74-76.

23

99.     TCPI completed the work required by the AOC in approximately 11 months, spending over $7 million to clean up the Disposal Site to the EPA's satisfaction. T.77. TCPI cleaned up and removed all the totes on the site, including some 90 totes that contained unknown non-glue related liquids and some material in 55-gallon drums. T.80, TCPI Ex. 2. All of those 90 totes were determined to be non-hazardous. TCPI Exhibit 2; T.271.

100.     Tom Stanek served as TCPI's on-site representative while the work under the AOC was performed and was on site 98% of the time the work was being performed. T.256.

101.     Liquid in the wastewater totes was removed from the totes and placed in frac tanks depending on whether or not it was hazardous or non-hazardous. Non-hazardous liquid was sent to Shamrock Environmental. T. 243.

102.     Tailored Chemical submitted a Final Report to the EPA on April 21, 2020. TCPI Exhibit 2 and Appendices; T.77. The details of the disposal of non-hazardous and hazardous liquid is described and explained in TCPI Exhibit 2 at Section 3.3 at 3.  The remaining sludge material in the totes was mixed with sawdust and Zappa Sorb, placed in trucks with special lining and hauled off the site. All tote container solidified solids were considered to be hazardous and were disposed of accordingly. The solidified material was transferred to one of three facilities. T. 255, TCPI Exhibit 2 at ¶ 4.2.

103.     The empty totes themselves were then crushed and disposed of in the local landfill. T.255-56.  Some non-tote materials were encountered in the maintenance buildings at the DAFCO Tote Site. TCPI had to put this material in lab packs and dispose of the material. TCPI Exhibit 2 at ¶ 6.0, p. 5.

104. AFP fully cooperated and provided unfettered access to the site to all local, state and federal officials. AFP executed the necessary access agreements to grant access for clean-up of the property. T.398.

105. A final site walk of the Disposal Site was conducted on February 18, 2020. In attendance were Ken Rhame, USEPA, Jeff Menzel, NCDEQ, Tom Stanek, TCPI, Gary Sparks from STAT and Steve Lucas from Lighthouse Technical. All in attendance agreed the site waste addressed in the AOC had been removed. TCPI Exhibit 2 at ¶ 7.0, p. 5.

106. AFP testified that its property was damaged during the cleanup, including damaged doors in the amount of $15,274.55 plus an additional $7,500 for new doors after the project was complete for total damages of $22,774.55. T.396, 413; AFP Exhibit 2. AFP also claims that it incurred the cost of a dumpster to remove the remaining material after cleanup in the amount of $1,106.64.

107. TCPI engaged Nidal Rabah P.E., PhD, Licensed Site Remediation Professional, who was recognized by the Court as an expert witness in the field of environmental engineering. T.286. The Court has relied on Dr. Rabah's expert opinion as to the response costs, etc. as described below.

108. Dr. Rabah reviewed relevant documents, including wastewater bills of lading, invoices, analytical testing data, remedial action work plan, the AOC and the Final Report. He evaluated the appropriateness and reasonableness of the emergency removal action at the Disposal Site and compared the procedures and actions under the AOC at the Disposal Site with the requirements of the National Contingency Plan CERCLA. T.288.

25

109.     Dr. Rabah's opined that the removal action under the AOC at the DAFCO Tote Site was appropriate, reasonable and consistent with the requirements of the National Contingency Plan. T. 290.

110.     Dr. Rabah also evaluated the reasonableness of the cost of the remedial action at the DAFCO Tote Site. Dr. Rabah reviewed the contractual documents with different remedial contractors, including unit costs. He reviewed commercially available databases for costs, unit costs and costs for assembly and for units of remediation. He further reviewed publicly available competitive bid unit costs with national and regional contractors with other governmental agencies to see the range of unit costs. Finally, Dr. Rabah compared the costs of the remedial action with local and regional contractors in North Carolina and in the immediate vicinity of North Carolina. T.291.

111.     Dr. Rabah testified that the overall cost of the work done under the AOC, which he calculated to be $829 per tote or $7,205,668, was reasonable; the structure of the team doing the work was reasonable; and that the costs of the remedial actions under the AOC at the Disposal Site were comparable and consistent with commercially available unit costs within the region for these types of actions at the time of implementation. T.291-292, 294.

112.     Dr. Rabah further opined that it is typical, at CERCLA sites, to have some of the waste characterized as hazardous and some as non-hazardous; however, in cleaning up a site, all waste, both hazardous and non-hazardous, must be removed. T.293.

113.     At the Court's invitation, AFP, KSI and Perry K offered evidence to the Court regarding their ability to pay any allocation ordered by the Court. T.518-537, 547-554.

114.     Mr. Anderson testified that AFP's assets included only the 22-23 acre former "Disposal Site" property in Hudson and the entity's bank account.  The tax value of the property is $1,125,000, and it is listed on AFP's tax return as having a value of $1.6 million, which Mr. Anderson said he believed was overstated based on recent sales of comparable property for less than $1 million. However, he acknowledged that he had offered the property for sale for $2.5 million (which he said was not a realistic selling price). There is no mortgage on the property. AFP has over $76,000 of "available cash" in its bank account, after deducting current year property taxes and security deposits. With respect to income, AFP's net income for 2022 was approximately $77,000. It has two tenants on the property who together pay approximately $10,500 a month ($126,000 a year). Mr. Anderson testified that the property is in need of deferred maintenance improvements which have been put off for many years. He estimated those repairs could cost more than $100,000, although his estimates (where he even had cost estimates) were just speculation based on his own limited internet research.

115.     Mark Kiser testified on behalf of KSI that the company, which is a real estate holding company, currently owns only 2.8 acres in Burke County with a tax value of $34,000 (on which is located a burned house that will cost approximately $17,000 to clean), a dam (which will require $30,000 in engineering costs to use) and $6,300 in a bank account. KSI also will have monthly income from the sale of other property totaling $44,000 during the next three years. Thus, Mr. Kiser claimed that KSI was "insolvent." However, the credibility of Mr. Kiser's testimony was undermined on cross-examination. During those examinations, he revealed that the purchase of the dam (during this litigation) was connected with his purchase of a golf course (of unknown value) which was not put in KSI's name. Similarly troubling, he testified that he "[didn't] recall"

KSI recently selling two properties for $1.4 million and another property for $650,000-$700,000. The Court does not find his claimed lack of recall of such significant transactions credible. Also, while he claimed that the proceeds from those sales paid debts on the properties, he produced no tax returns or documentation to support his testimony.

116.    Perry K testified that he has an approximate current and future income of $70,000 to $90,000 per year. In 2021, his income was over $130,000, but he claims that has been adversely impacted by the lawsuit. Perry K's only significant assets are a bank account with $16,000 and a house he owns as Tenants by the Entirety with his wife, which has equity of $80,000 to $100,000. Also, Perry K currently has an outstanding judgment against him held by KSI of approximately $125,000. As with the other witnesses, Perry K presented no independent documentary support for his testimony. T.550-552.

## II.    CONCLUSIONS OF LAW

1.    This Court has subject matter jurisdiction over this case based upon the presence of a federal question, 28 U.S.C. §1331, and Section 113(b) of CERCLA, 42 U.S.C. §9613(b). *See W.VA. State Univ Bd. Of Governors v. Dow Chem. Co.,* 23 F. 4th 288, 308 (4th Cir. 2022). No party has objected to this Court's personal jurisdiction over any party or this judicial district being the proper venue for this action based on the Disposal Site being located within the district.

2.    "Congress enacted CERCLA to address the increasing environmental and health problems associated with inactive hazardous waste sites." *Nurad, Inc. v. William E. Hooper & Sons Co*., 966 F.2d 837, 841 (4th Cir. 1992). Section 107 of CERCLA provides for strict liability for responsible parties. *See United States v. Monsanto*, 858 F.2d 160, 167 (4th Cir. 1988). Indeed, "CERCLA encourages private individuals to clean up environmental hazards by permitting them

to recover specified costs of cleanup from parties defined by CERCLA to be responsible for the hazards." *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 677 (4th Cir. 1995).

3.      A private-party plaintiff establishes a prima facie case for cost recovery under CERCLA by establishing that (1) the defendant is a potentially responsible person ("PRP"); (2) the site is a CERCLA "facility"; (3) a hazardous substance has been released or threatens to be released from the defendant's facility; and (4) the release or threatened release has caused the plaintiff to incur response costs that are "necessary" and "consistent with the National Contingency Plan." *See PCS Nitrogen Inc. v. Ashley II of Charleston, LLC*, 714 F.3d 161, 167-68 (4th Cir. 2013); *see also, Westfarm*, 66 F.3d at 677 (noting cost-recovery elements and stating the claimant must show it incurred necessary response costs).

4.      CERCLA provides two causes of action: one for recovery of response costs under § 107(a) and one for contribution under §113(f)(1). A person who incurs cleanup costs is entitled to recover from anyone who qualifies as a "responsible person" under the statute. 42 U.S.C. §9607(b)(3). CERCLA identifies four categories of PRPs liable for costs incurred in response to a release of hazardous substances: "(1) the current 'owner' or 'operator' of a 'facility'; (2) any 'person' who 'owned' or 'operated' the 'facility' at the time of disposal of a hazardous substance; (3) any 'person' who 'arranged for disposal or treatment' of hazardous substances at the 'facility'; and (4) any 'person' who accepts hazardous substances 'for transport to disposal or treatment facilities, incineration vessels or sites.'" *PCS Nitrogen*, 714 F.3d at 172 (quoting 42 U.S.C. § 9607(a)(1)-(4)).

5.     To establish a prima facie case for cost recovery under § 107(a), a plaintiff must prove four elements: "(1) the site is a "facility"; (2) a release or threatened release of hazardous substances has occurred; (3) the release has caused plaintiff to incur 'necessary costs of response'; and, (4) the defendant falls within one of the four categories of PRPs." *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp*., 153 F. 3d 344, 347-348 (6th Cir. 1998). Once it is established that there is an entitlement to cost recovery, the person seeking recovery must establish that they are entitled to costs that are incurred not inconsistent with the National Contingency Plan ("NCP"). *Id*. at 347.

6.     Section 113(f) grants any person liable under section 107(a) a right to "seek contribution from any other person who is liable or potentially liable" under section 107(a). 42 U.S.C. 9613(f)(1). "In resolved contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Id*. "This plain language grants a court significant discretion to choose which factors to consider in determining equitable allocation of liability." *PCS Nitrogen*, 714 F.3d at 186.

7.     TCPI is a "person" as that term is defined in 42 U.S.C. §9601(21).

8.     The AOC is an administrative settlement pursuant to which Respondent TCPI resolved its liability to the United States within the meaning of 42 U.S.C. §9613(f) (3) (B) of CERCLA. TCPI Exhibit 1 at ¶ 80.

9.     In analyzing the merits of a contribution claim under §113 of CERCLA, courts conduct a two-part inquiry: First, the court must determine whether the defendant is 'liable' under CERCLA §107(a); Second the court must allocate response costs among liable parties in an equitable manner. *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc*., 791 F. Supp. 2d 431, 490 (D.S.C. 2011), aff'd, 714 F.3d 161 (4th Cir. 2013). A party seeking contribution under § 9613(f)

30

bears the burden of proving each party's equitable share of response costs. *Dixon Lumber Co., Inc. v. Austinville Limestone Co., Inc*., 386 F. Supp. 3d 688, 715 (W.D. Va. 2019); *PCS Nitrogen*, 714 F.3d at 185.

10.     CERCLA liability may be inferred from the totality of the circumstances and need not be proven by direct evidence.  *PCS Nitrogen*, 714 F.3d at 177. Thus, the District Court may find as a fact an inference of CERCLA liability if "plausible in light of the record viewed in its entirety." *Id*. (quoting *Davis v. Richmond, Fredericksburg & Potomac R.R. Co*., 803 F.2d 1322, 1327 (4th Cir.1986)).

11.     As described below, the Court concludes that AFP, DAFCO, KSI, Perry K and Elizabeth K are potentially liable under 42 U.S.C. § 9607(a) and determines their respective equitable shares of TCPI's response costs as potentially responsible parties.

## A.     AFP's LIABILITY UNDER CERCLA § 107(a)

12.     Under § 9607(a) (2) of CERCLA, the owner or operator of a facility at the time a hazardous substance was disposed of at the facility is potentially responsible under § 9607(a).

13.     § 9601(9)(B) of CERCLA defines "facility" to mean "… any site or area where a hazardous substance has been deposited, stored, disposed of, placed or otherwise come to be located."

14.     The property owned by AFP located at 2698 Hickory Boulevard, in Hudson, North Carolina, also referred to as the "Disposal Site," is a facility as that term is defined in 42 U.S.C. § 9601(9)(B).

15.     The contamination found at the DAFCO Tote Site includes a hazardous substance ("PCE") as that term is defined at 42 U.S.C. §  9601(14).

16.     AFP was the owner of the Disposal Site when hazardous substances were disposed of or released at the site. As the owner of the facility when and where the hazardous waste was disposed, AFP is a responsible party and is potentially liable. "The trigger to liability under CERCLA is the ownership or operation of the facility at the time of disposal, not culpability or responsibility for contamination." *Nurad Inc*., *supra*. CERCLA is a strict liability statute. The plain language of §107(a) (2) of CERCLA extends liability to owners of waste facilities regardless of their participation in the subsequent disposal of hazardous waste. *U.S. v. Monsanto*, 858 F. 2d 160 (4th Cir. 1988).

17.     AFP leased the property at 2698 Hickory Boulevard to DAFCO beginning in June 2014, and renewed the lease in 2015. AFP was aware that wastewater totes were coming onto the site either from DAFCO's customers or were being delivered from DAFCO's former operation at the Virginia Street Property.

18.     Some of the material in the totes and all of the sludge in the totes was determined to be hazardous.

19.     As the owner of the DAFCO Tote Site where hazardous materials were stored and released, AFP is liable under §9607(a)(2) of CERCLA.

20.     Though presumptively liable, a landowner can escape liability by demonstrating, by a preponderance of the evidence, that he is entitled to one of the statute's affirmative defenses. CERCLA §107(b)(3) provides in relevant part:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by…(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly with the defendant … if the

defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all the relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions …

42 U.S.C. § 9607 (b) (3).

21.     This "innocent landowner" defense under § 9607(b)(3) requires a party otherwise liable as a PRP to prove "by a preponderance of the evidence: (1) that another party was the 'sole cause' of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment, or agency relationship with the defendant; and (3) that the defendant exercised due care and guarded against the foreseeable acts or omissions of the responsible party." A party must establish all three prongs of the defense. *PCS Nitrogen*, 714 F.3d at 179.

22.     AFP has satisfied the first prong, as there is no allegation that AFP was a cause of the release of hazardous substances.

23.     However, even if the contractual relationship between AFP and DAFCO is insufficient to prove the exception to the defense because the threatened release of hazardous waste arguably did not occur "in connection with" their contract, *see Shapiro v. Alexanderson*, 743 F. Supp. 268, 271 (S.D.N.Y. 1990), the Court concludes that, for the reasons discussed above, AFP did not exercise due care and guard against the foreseeable acts or omissions of the responsible party. For example, while AFP told DAFCO that it did not want any hazardous waste on the property, it failed to reasonably monitor DAFCO's activities, including failing to require DAFCO to provide evidence of appropriate government permits or even to regularly check on the number of totes on the premises, which could have significantly limited the scope of the problem. Further,

33

even after AFP was aware of the number and condition of the totes at the site, it failed to take immediate action against DAFCO (although it ultimately filed a legal action against TCPI and cooperated with state and federal regulators in an effort to have the totes removed and avoid liability). Thus, while all the exculpatory circumstances argued by AFP will be taken into account in allocating liability, AFP is not entitled to escape all liability under the "innocent landowner" defense.

## B. DAFCO LIABILITY UNDER CERCLA § 107(a)

24.     DAFCO was the operator of the Disposal Site, pursuant to its lease from AFP.

25.     CERCLA circularly defines "operator" as "any person ... operating [a] facility." 42 U.S.C. § 9601(20)(A)(ii). In 1992, the Fourth Circuit explained that an operator "need not have exercised actual control in order to qualify as [an] operator[ ] ..., so long as the authority to control the facility was present." *Nurad*, 966 F.2d at 842. Most other circuits endorsed a different view, finding that an operator is "someone actively involved in running the facility, typically on a day-to-day, managerial basis." *See United States v. Friedland*, 173 F. Supp. 2d 1077, 1094 n.4 (D. Colo. 2001). In 1998, the Supreme Court addressed the circuit split, describing an "operator" as follows, according to the word's "ordinary or natural meaning":

> [A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998); *See also*, *W. Virginia Hosp. & Travel Ass'n, Inc. v. Am. Water Works Co., Inc*., No. 2:16-CV-00184, 2018 WL 1353118, at *4–5 (S.D.W. Va. Mar. 15, 2018).

34

26.     DAFCO conducted all the operations specifically related to the handling and the disposal of the TCPI totes and any hazardous waste contained in them as well as being responsible for compliance with environmental regulations. DAFCO brought thousands of totes of untreated wastewater onto the AFP property during the term of its lease, either by directing its customers to ship totes to the site, or accepting untreated wastewater totes sent to the site from the facility it formerly operated at the Virginia Street Property in Lenoir.

27.     DAFCO failed to appear at trial and offer any defense at trial.

28.     DAFCO is therefore potentially liable under 42 U.S.C. §9607(a) (2) as an operator of the Disposal Site.

## C.     PERRY KEISTER's LIABILITY UNDER CERCLA § 107(a)

29.     The Court also concludes that Perry K was an operator of the Disposal Site as well as a "person" who "arranged for disposal or treatment" of hazardous substances at the "facility." 42 U.S.C. § 9607(a)(2)-(3).

30.      Perry K was the Chief Technical Officer of DAFCO and had actual and apparent authority to represent DAFCO in its dealings with TCPI. Further, by virtue of his knowledge, experience and status as the father of DAFCO's teenage president, when important or difficult operational or transactional situations arose with the company Perry K usually handled them. For example, TCPI and KSI dealt almost exclusively with Perry K and rarely with Elizabeth K between 2010 and 2016.  Perry K also introduced McKittrick and Eco-Tote to DAFCO. Then, Perry K arranged and participated in the meeting in December, 2016 between the Temples, Anderson, Stanek and Tom McKittrick at the Eco-Tote Facility after DAFCO was sold to Eco-Tote. Further,

Perry K arranged with KSI for the transport of totes from the Virginia Street Property to the Disposal Site.

31.     Although Perry K was not a formal officer or owner of DAFCO, the Court need not elevate form over substance because an independent contractor may be liable as a CERCLA operator if he had authority to control hazardous wastes that were the source of the contamination. *Bestfoods*, 524 U.S. at 66-67. The Court finds that as a practical matter Perry K had and exercised that authority and is potentially liable under CERCLA as an operator of the DAFCO Tote Site under §9607(a). Also, Perry K is potentially liable as an "arranger" of the transportation of hazardous wastes from the Virginia Street Property to the Disposal Site under § 9607(a).

### D.     ELIZABETH KEISTER's LIABILITY UNDER CERCLA § 107(a)

32.     Elizabeth K was president of DAFCO. Elizabeth K negotiated the leases in 2014 and 2015 of the AFP property in Hudson. Elizabeth K handled all communications and business dealings with AFP regarding the leases of the property and the storage of totes on the property. She also participated in operations at the Disposal Site, both when she was DAFCO's president and when she worked for Eco-Tote after DAFCO sold its assets.

33.     Elizabeth K was the president of the company that abandoned more than 8,000 untreated totes of wastewater at the Disposal Site.

34.     While mere status as corporate officer or director is insufficient to impose CERCLA liability,   *City of N. Miami, Fla. v. Berger*, 828 F. Supp. 401, 411 (E.D. Va. 1993), an officer who acts as corporation's on-site manager and had substantial influence over management decisions is considered an "operator" under CERCLA who could be held liable for response costs.

*See United States v. Carolina Transformer Company*, 978 F.2d 832 (4th Cir. 1992) (corporate director and president held liable as operators).

35.     Elizabeth K is thus potentially liable under CERCLA as an operator of the DAFCO Tote site under § 9607(a) (2) of CERCLA.

### E.     KSI's LIABILITY UNDER CERCLA § 9607(a)

36.     Any person who, by contract, agreement or otherwise, arranged for disposal or treatment or arranged with a transporter for disposal or treatment of hazardous substances owned or possessed by such person or any other party or entity for  transportation of hazardous waste to a facility for disposal or treatment is liable under 42 U.S.C. §9607(a)(3).

37.     What qualifies as "arranging for disposal" under CERCLA "is clear at the margins but murky in the middle." *Consolidation Coal Company v. Ga. Power*, 781 F. 3rd 129, 147 (4th Cir. 2015) ("At one extreme [of the analysis of "arranger" liability], liability clearly attaches if an entity enters a transaction for the sole purpose of discarding a used and no longer useful substance.").

38.     In *Burlington Northern & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599 (2009), the Supreme Court established the legal requirements of arranger liability. Under *Burlington Northern*, in order to establish arranger liability, the plaintiff must prove that the defendant specifically intended to dispose of hazardous materials at the site, not just that it knew or should have known of the potential for hazardous substance disposal when it contracted for a specific activity to be undertaken by another person. *Id.* at 610.

39.     While KSI arranged with Perry K, acting on behalf of DAFCO and KSI's sister company, Marx Enterprises, to transport approximately 8,000 totes of untreated wastewater from

the Virginia Street Property to the Disposal Site and KSI's sole purpose in shipping the totes to the Disposal Site was to get rid of thousands of totes on its property with no value to KSI (indeed, it was a benefit to KSI to remove the totes), in light of all the circumstances, including the EPA investigations at the Virginia Street Property, the Court finds there is insufficient evidence to prove that KSI had the specific intent to dispose that is required under the *Burlington Northern* standard. Indeed, there is no evidence that KSI even "should have known" of contamination at the Property. Therefore, TCPI has not met its burden to establish arranger liability under 42 U.S.C. §9607(a)(3). *See In re Kaiser Gypsum Co., Inc.*, No. 16-31602 (JCW), 2020 WL 6737641, at *15 (Bankr. W.D.N.C. Nov. 13, 2020).

40.     Moreover, the Court finds that KSI would qualify for the "innocent landowner" defense under § 9607(b)(3). Although KSI allowed DAFCO to remain on the Virginia Street Property and pay rent, it did so after DAFCO had obtained permits and there had been an inspection by the EPA that did not result in any finding of hazardous waste. Also, KSI promptly pursued eviction against DAFCO and only moved the totes themselves after DAFCO and Perry K failed to follow through on agreements to do so.

### F.     AFP's CLAIMS

41.     AFP has asserted claims for the damages it sustained as a result of the cleanup at the Disposal Site against third party defendant Southern Resin and others pursuant to 42 U.S.C.S. § 9607(a), which allows potentially responsible parties to bring claims against other potentially responsible parties when such claims are not a result of settlement or litigation with the Federal Government. *See United States v Atl. Research Corp*., 551 U.S. 128 (2007). Claims brought pursuant under §9607(a) of CERCLA can be brought against other potentially responsible parties

defined therein and to make them jointly and severally responsible for all necessary costs of response incurred by a party consistent with the National Contingency Plan. *Id*. at 132.

42. The Court finds that Southern Resin is potentially liable under CERCLA as an "arranger" of the transportation of hazardous waste. *See* 42 U.S.C. §9607(a)(3). While, again, it is uncertain exactly which totes Southern Resin transported to the Virginia Street Property and the Disposal Site because the totes were never tracked, there is no dispute that the company did transport totes to both locations, which ultimately were cleared of totes, which (in the aggregate) held waste found to be hazardous. Therefore, the Court will infer Southern Resin's CERCLA liability as an "arranger" from the totality of the circumstances

43. While AFP offered evidence of costs it incurred related to the removal of the totes from the Disposal Site, it did not offer any evidence that such costs were necessary or reasonable or incurred consistent with the National Contingency Plan. Nevertheless, the Court will, as discussed below, credit AFP's payments as part of the net allocation of response costs among TCPI and the defendants. Accordingly, AFP's claims against the other defendants are, as a practical matter, moot. Having received credit for their costs in the equitable allocation process, AFP cannot recover separately against the other defendants, which would amount to a double recovery.

## G. ALLOCATION OF RESPONSE COSTS

44. TCPI incurred response costs in the course of conducting the remedial action at the Disposal Site required under the AOC. AFP also incurred costs related to the cleanup of the site.

45. The actions undertaken by TCPI at the Disposal Site were response actions within the meaning of 42 U.S.C. § 9601 (25).

39

46.     The work done by TCPI at the Disposal Site under the AOC was appropriate, reasonable and done in accordance with the requirements of the National Contingency Plan promulgated under 42 U.S.C. § 9605(a) and codified at 40 C.F.R. part 300 et seq..

47.     Where costs are incurred pursuant to an Administrative Order issued by EPA or a Consent Order between the plaintiff and the EPA, there is a presumption that those costs are consistent with the National Contingency Plan. 40 C.F.R.§ 300.700 (c)(3)(ii); *Pneumo Abex Corp. v. Bessemer & Lake Erie R. Co*., 936 F. Supp. 1250, 1260 (E.D. Va. 1996).

48.     The response costs of $7,205,668 incurred by TCPI in conducting the remedial action at the Disposal Site were reasonable, necessary and consistent with the National Contingency Plan

49.     42 U.S.C. §9613 authorizes courts to "allocate response costs among liable parties using such equitable factors as the courts determine are appropriate." *Nurad*, *supra*, at 841.

50.     "While CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm." *Monsanto*, 858 F.2d at 171. The Supreme Court has confirmed that "[t]he universal starting point for divisibility of harm analyses in CERCLA cases is § 433A of the Restatement (Second) of Torts." *Burlington Northern & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 614 (2009).

51.     "Under the Restatement, when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.... But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm." *Id*. Thus, potentially responsible parties can avoid joint

40

and several liability by establishing either that on-site harms are distinct, or that there exists "a reasonable basis for apportioning liability" for a single harm "among responsible parties." *PCS Nitrogen*, 714 F.3d at 181–82; *Monsanto*, 858 F.2d at 172 (citing Restatement (Second) of Torts § 433B (1965)).

52.     The Court finds that the harm in this case is capable of apportionment, and that equity requires that the dollar cost of remediating the harm be allocated among the parties, including TCPI, AFP, Perry K and Elizabeth K. The Court makes no allocation of costs to DAFCO or Eco-Tote because, although an allocation would otherwise be warranted, both entities are no longer in existence.

53.     Courts have broad authority when allocating costs under § 9613. Many courts have used the "Gore Factors." Those include:

1.     The ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

2.     The amount of hazardous waste involved;

3.     The toxicity of the hazardous waste involved;

4.     The degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of hazardous waste;

5.     The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and,

6.     The degree of cooperation by the parties with Federal, State, or local officials to prevent harm to the public health or the environment.

*See Dixonville Lumber Company, Inc. v. Austinville Limestone Company*, 386 F. Supp. 3d 688, 718, 719 (W.D. Va. 2019). In addition to the aforementioned factors, courts "have broad and loose" authority to determine which equitable factors should be used in making the ultimate cost

41

allocation. *Valbruna Slater Steel Corporation v. Joslyn Manufacturing*, 298 F. Supp. 3d 1194, 1197 (N.D. Indiana 2018).

54.     Courts also consider the "Torres Factors," which include "(1) [t]he extent to which cleanup costs are attributable to wastes for which a party is responsible; (2) [t]he party's level of culpability; (3) [t]he degree to which the party benefitted from disposal of the waste; and (4) [t]he party's ability to pay its share of the cost." *In re Kaiser Gypsum*, 2020 WL 6737641, at *16; *PCS Nitrogen*, 714 F.3d at 186 ("The court's ultimate allocation of liability reasonably weighs relevant factors, including the degree of involvement each party had in disposals (both primary and secondary) on the site, the degree of care each party exhibited with respect to hazardous substances, the degree to which each party cooperated with government officials with respect to hazardous substances, and the benefit each party reaped from disposals of hazardous substances on the site.").

55.     A plaintiff seeking recovery of response costs "…need not establish a direct causal connection between the hazardous substance released by the Defendants and the incurrence of response costs." *Coeur D'Alene Tribe v. Asarco Inc*., 280 F. Supp. 2d 1094, 1124 (D. Idaho 2003) (citing *U.S. v. Alcan Aluminum Corp*., 964 F. 2d. 252 (3rd Cir. 1992)).

56.     All of the parties in this case participated in and/or contributed to the generation, transport, treatment and/or storage of hazardous waste. As acknowledged by TCPI during trial, all but a small portion of the waste originally came from TCPI. Further, while it believed the waste to be non-hazardous, TCPI did not test the untreated waste and sought to take full advantage of its agreement with DAFCO as a means to rid itself of the totes, particularly those which had accumulated in its Longview facility. TCPI did not exercise due diligence in monitoring DAFCO's

42

permits to treat the waste nor DAFCO's progress in cleaning the totes. To the contrary, TCPI continued to deliver totes to the Disposal Site (and to the Virginia Street Property as well) after it should have been clear that DAFCO was either unable or unwilling to timely and properly process the totes. Thus, TCPI must bear the vast majority of the costs it has already paid to clean up the Disposal Site. However, as discussed below, it would not be equitable to require it to bear 100% of the costs.

57.     DAFCO, Perry K and Elizabeth K are culpable and responsible for agreeing to accept wastewater totes for treatment and cleaning, accepting payment of more than one million dollars and abandoning some 8,000 totes, first at the Virginia Street Property and then at the Disposal Site. Had these defendants been honest and accountable concerning their ongoing inability to process the totes, then the situation might have been resolved years earlier and not multiplied into the problems and chaos that ensued at the Disposal Site. However, DAFCO's dissolution and Perry K and (presumably)[1] Elizabeth K's very limited financial resources do not permit the Court to allocate the full amount that their role, benefit and culpability would require if they had the means to reimburse TCPI for a substantial portion of the response costs.

58.     After TCPI, AFP will be allocated the largest share of the response costs. AFP agreed to rent a portion of the site to DAFCO and expanded their rental relationship. While, as with all the parties, AFP denies any knowledge of hazardous waste, AFP failed to exercise due care and diligence in monitoring DAFCO, which was a substantial factor in the accumulation of

---

[1] As noted, Elizabeth K did not appear or participate in the trial. Indeed, the parties neither presented nor sought any evidence of her whereabouts or current activities, even from her father. Further, the parties took a decidedly "hands off" approach to blaming her personally for DAFCO's failures and KSI testified that it had stopped pursuing its judgment against her after only a small payment.

totes on the property. And, perhaps most significantly, AFP benefitted greatly from the cleanup of its property by TCPI. Its property has been clean since early 2020, and AFP receives annual rent of more than $10,500 per month. AFP also received approximately $63,000 in rent from DAFCO during the period when DAFCO was leasing the property. So, AFP will be allocated a meaningful share of the response costs, while being credited with the costs and damages it incurred directly related to the cleanup (but not its speculative future costs to improve the property). Also, AFP will be given a reasonable amount of time to pay its share of the response costs.

59.     An important factor in allocation of response costs is the degree of cooperation with federal and state officials to prevent harm to the public and the public health. The degree of cooperation with government officials to prevent any harm to the public health or the environment is crucial to the contribution analysis. TCPI entered into the AOC with EPA, cleaned up the site in less than a year and spent more than $7 million doing so. AFP also cooperated with the regulators, except with respect to its refusal to participate in the AOC due to its financial situation (and belief as to its innocence, which is less exculpatory as a reason not to cooperate as presumably many of those asked to participate in CERCLA cleanups similarly deny any responsibility). There is no evidence that KSI, DAFCO, Perry K or Elizabeth K failed to cooperate with the government to the extent they were asked to do so. The Court has taken all of this into account in its allocation of the response costs.

60.     AFP and Perry K offered evidence as to their limited ability to pay as discussed above.

44

61.     Mathematical precision in the allocation process is not realistic and is not part of the plaintiff's burden for establishing an equitable share. *Asarco LLC v. Atlantic Richfield Company*, 353 F. Supp. 3d 916, 950 (D. Montana 2018).

62.     Having considered the facts and the law in this case and all the various equitable factors described above, the court determines with respect to allocation as follows:

- TCPI  - 92% ($6,629,214)

- AFP - 6% ($432,340)

- Perry K - 1% ($72,057)

- Elizabeth K - 1% ($72,057)

63.     In the exercise of its discretion, the Court has included consideration of pre-judgment interest under 42 U.S.C. § 9607(a)(4) in making the allocation described above. Therefore, TCPI is not entitled to receive additional pre-judgment interest from any of the defendants.

### III.     JUDGMENT

**NOW THEREFORE IT IS ORDERED THAT:**

Pursuant to the foregoing Findings of Fact and Conclusions of Law, Judgment shall be entered by the Clerk of Court in favor of Plaintiff, Tailored Chemical Products, Inc. and against certain defendants as follows:

1.     $350,257 against Anderson Family Properties, representing AFP's share of the response costs Tailored Chemical Products paid for the work done under the Administrative Order on Consent for the DAFCO Tote Site ($432,340), less a credit of $82,083 for the expenses and damages AFP incurred with respect to the Disposal Site.

45

AFP is required to pay this judgment in equal pro-rata monthly amounts over 60 months. No post-judgment interest is due on these payments and AFP may prepay the judgment at any time without penalty;

2. $72,057 against Perry Keister, representing Perry K's share of the response costs Tailored Chemical Products paid for the work done under the Administrative Order on Consent for the DAFCO Tote Site;

3. $72,057 against Elizabeth Keister, representing Elizabeth K's share of the response costs Tailored Chemical Products paid for the work done under the Administrative Order on Consent for the DAFCO Tote Site;

4. No monetary judgment is entered against Southern Resin or any other defendant on AFP's claims;

5. KSI is dismissed from this action; and

6. Each party shall bear their own costs and expenses in the exercise of the Court's discretion.

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: December 14, 2023

Kenneth D. Bell
United States District Judge

46